UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------
SINISA KEKOVIC aka SASHA KEKOVIC,

                          Plaintiff,

                                                    **MEMORANDUM & ORDER**
                v.                                   22-CV-2142 (MKB)

TITAN MOTOR GROUP LLC, DOMSCO
MOTORS LLC, JOSEPH VALENTINO, and
SALVATORE AMENDOLA,

                          Defendants.
----------------------------------------------------------------
MARGO K. BRODIE, United States District Judge:

        Plaintiff Sinisa Kekovic, also known as Sasha Kekovic, commenced the above-captioned

action on April 13, 2022 and filed an Amended Complaint on September 15, 2022 and a Second

Amended Complaint ("SAC") on November 3, 2022, against Titan Motor Group LLC ("Titan"),

and Domsco Motors LLC ("Domsco") (collectively, the "Corporate Defendants"), and against

Joseph Valentino and Salvatore Amendola (the "Individual Defendants").  (Compl., Docket

Entry No. 1; SAC, Docket Entry No. 20.)  Plaintiff alleges against the Corporate Defendants

hostile work environment and retaliation claims in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); Section 1981 of the Civil Rights Act of 1866,

42 U.S.C. § 1981 ("section 1981"); and against all Defendants hostile work environment and

retaliation claims in violation of the New York State Human Rights Law, New York Executive

Law § 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, New York City

Administrative Code § 8-107(1) *et seq.* ("NYCHRL"); and a claim for tortious interference with

prospective economic advantage in violation of New York common law.  (SAC ¶¶ 73–127.)

Plaintiff alleges that Valentino and Amendola used a racial slur and after he complained about it, they engaged in discriminatory and retaliatory actions against him.  (SAC ¶¶ 23–127.)

Defendants move to dismiss the SAC for failure to state a claim, and Plaintiff opposes the motion.[1]  For the reasons set forth below, the Court grants in part and denies in part Defendants' motion to dismiss.

## I.  Background

### a.  The parties

Titan operates at least six car dealerships, including a dealership operating under the trade name Hillside Toyota, located in Jamaica, New York.[2]  (SAC ¶ 12.)  Domsco directly owns Hillside Toyota.  (*Id.*)  Titan and Domsco share common ownership.  (*Id.* ¶ 14.)  Valentino served as CEO of both Corporate Defendants, and he possessed authority to make personnel decisions on behalf of Titan.  (*Id.* ¶ 13.)  Amendola was employed by the Corporate Defendants as a general manager, and he possessed authority to make personnel decisions on their behalf. (*Id.* ¶ 19.)  Plaintiff identifies as a white male "married to a black, African American woman," with whom he has two children.  (*Id.* ¶¶ 26, 27.)

### b.  The October 8, 2020 incident

Plaintiff was hired as a General Sales Manager for Hillside Toyota on or about February 18, 2019.  (*Id.* ¶ 23.)  Plaintiff was responsible for selling automobiles and received a base salary of $2,500 per week plus a 1.25% commission on the gross profit from sales.  (*Id.* ¶¶ 23, 24.)

---

[1]  (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 25; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 25-2; Pl.'s Mem. in Opp'n to Defs.' Mot. ("Pl.'s Mem."), Docket Entry No. 26; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 27.)

[2]  The Court assumes the truth of the factual allegations in the SAC for the purposes of this Memorandum and Order.

After approximately five months of employment, Plaintiff's commission rate was raised to 2% due to his outstanding work performance.  (*Id.* ¶ 25.)  By October of 2020, Plaintiff had exceeded Defendants' expectations of his work performance and, as a result, Defendants invited Plaintiff to dinner at Opus Steakhouse in Jericho, New York to celebrate his achievements.  (*Id.* ¶¶ 29–31.)

On or about October 8, 2020, Plaintiff, Valentino, and Amendola met for dinner.  (*Id.* ¶ 32.)  While discussing how nice the restaurant was, Valentino commented to Plaintiff and Amendola: "Yes, and there are no n****rs here as well."  (*Id.* ¶ 34.)  Plaintiff told Valentino that his wife and children were Black and that he took offense to this remark.  (*Id.* ¶ 35.)  Neither Valentino nor Amendola apologized for the remark.  (*Id.* ¶ 36.)  Valentino turned to Amendola and rhetorically asked him, "how much is this going to cost me?"  (*Id.* ¶ 37.)  Shortly after the remark, Valentino and Amendola went to the restroom for approximately fifteen minutes, where they further discussed the discriminatory remarks and Plaintiff's reaction.  (*Id.* ¶¶ 39, 40.)

### c.   Post-incident events and termination

The following day, Plaintiff complained to Amendola about Valentino's remark.  (*Id.* ¶ 41.)  Amendola responded: "[O]h, you know, he is an old-fashioned guy, that's why . . . ."  (*Id.* ¶ 42.)  Amendola subsequently installed security cameras at Hillside Toyota, one of which exclusively focused on Plaintiff's desk.  (*Id.* ¶ 44.)  Amendola then called Plaintiff into his office to show him that a screen focused on Plaintiff's desk.  (*Id.* ¶ 45.)  Plaintiff complained that he was uncomfortable being watched all day, to which Amendola replied: "[I]t's my job to make you feel uncomfortable," and further stated that he knew what "real harassment" looked like, and that he knew "how to be a boss" for Defendants.  (*Id.* ¶¶ 46, 48, 49.)  Almost half of the television screens depicting the security footage exclusively displayed Plaintiff's desk.  (*Id.*

¶ 47.)  Only Plaintiff's desk was exclusively monitored at all times by the newly installed security cameras.  (*Id.* ¶ 50.)

In or around April of 2021, Amendola altered Plaintiff's work schedule to require him to work at Hillside Toyota when the dealership was closed to the public.  (*Id.* ¶¶ 51–52.)  Amendola did not similarly alter any other employee's schedule and did not require any other manager to work outside normal operating hours.  (*Id.* ¶¶ 54–55.)  When Plaintiff complained to Amendola and questioned why Amendola changed his schedule making him the only manager required to work until 8:00 PM, Amendola responded: "Because I can."  (*Id.* ¶ 57.)

Plaintiff worked the changed schedule until Defendants terminated him on or about January 20, 2022.  (*Id.* ¶¶ 58–59.)  In terminating Plaintiff, Amendola explained to Plaintiff that Defendants wanted to "go in a different direction."  (*Id.* ¶ 60.)  At the time of his termination, Plaintiff had led Defendants to "drastic growth in gross profit," hired nearly three-fourths of Defendants' staff at Hillside Toyota, and implemented several processes to enable Defendants to increase their effectiveness at selling automobiles.  (*Id.* ¶ 62.)

### d.  Post-termination events

Plaintiff contends that after Defendants terminated him, Valentino called local dealerships and gave them false information about Plaintiff.  (*Id.* ¶ 65.)  In one instance, Plaintiff arranged a meeting with the General Manager of Plaza Auto Mall to discuss potential employment, but after Valentino communicated false information about Plaintiff to the General Manager, the General Manager cancelled the meeting with Plaintiff.  (*Id.* ¶ 66.)

## II.    Discussion

### a.    Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor."  *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (same).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (quoting *Iqbal*, 556 U.S. at 678).

### b.    Titan and Domsco are a single employer

Defendants argue that the Court should dismiss all claims against Titan because, based on Valentino's affidavit, Titan "was never Plaintiff's employer."  (Defs.' Mem. 6.)  In the alternative, Defendants argue that the Court should convert their 12(b)(6) motion into a motion for summary judgment since it "relies on materials outside of the [C]omplaint."  (*Id.*)

Plaintiff argues that he provides sufficient factual allegations in the SAC to "clear the low pleading bar" of showing that "Titan and Domsco form a single employer" and that "Plaintiff's

allegations readily demonstrate each of the [four] factors" required to establish a single employer under Second Circuit precedent.  (Pl.'s Mem. 4–6.)  Plaintiff further argues that it would be error to rely on the Valentino Affidavit since it was improper for Defendants to submit it at the pleading stage and because it contradicts allegations contained in the SAC.  (*Id.* at 7.)

### i.  Documents other than the pleadings

The Court declines to consider Defendants' affidavit.  On a motion to dismiss, "the district court is normally required to look only to the allegations on the face of the complaint" but "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice."  *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (holding that courts may consider on a motion to dismiss "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" and other documents "integral" to the complaint (first quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); and then quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010))); *see also, e.g.*, *Global Network Commc'ns., Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (finding reversible error where the district court considered defendant's submission of a trial transcript in an unrelated proceeding and relied on it to "make a finding of fact that controverted the plaintiff's own factual assertions set out in its complaint").

### ii.  Conversion to a summary judgment motion

In converting a motion to dismiss, "[t]he essential inquiry is whether the [non-moving party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to

6

meet facts outside the pleadings." *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008) (quoting *In re G&A Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985), *cert. denied*, 475 U.S. 1015 (1986)); *see also Parada v. Banco Industrial De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014) ("[A] district court acts properly in converting a motion . . . into a motion for summary judgment when the motion presents matters outside the pleadings" and the court gives "sufficient notice to an opposing party and an opportunity for that party to respond." (internal quotation marks omitted) (quoting *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009))); *Galiotti v. Green*, 475 F. App'x 403, 404 (2d Cir. 2012) (quoting same); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995) (noting that the party opposing the motion must be given "sufficient notice" and an opportunity to respond).

The Court declines to convert Defendants' motion to a motion for summary judgment. Although both parties have submitted materials outside the pleadings to the Court, the Court has given no prior indication that it would consider either party's extrinsic evidence. Conversion to summary judgment would therefore be improper at this stage. *See Sahu*, 548 F.3d at 69 (finding that conversion was inappropriate when it was unclear at the close of briefing that the district court would accept the movant's invitation to consider extrinsic evidence and convert the motion into a summary judgment motion); *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 115 (2d Cir. 1999) (noting that "care should, of course, be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried" (internal quotation marks omitted) (quoting *Ramsey v. Coughlin*, 94 F.3d 71, 73–74 (2d Cir. 1996))).

### iii.   Plaintiff has sufficiently alleged that Titan and Domsco are a single employer

"A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise . . . .'" *Arculeo v. On-Site Sales & Mktg, LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (alteration in original) (citations omitted).  One of the most common examples of a "single employer" is two separate corporations under common ownership and management.  *Id.* ("[E]xamples [of a single employer include] separate corporations under common ownership and management . . . ."); *see also Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 30 (2d Cir. 2015) ("Under the single employer doctrine, 'separate corporations under common ownership and management . . . can be deemed to constitute a single enterprise.'" (quoting *Arculeo*, 425 F.3d at 198)).  "[T]he policy underlying the single employer doctrine is the fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship." *Stoutenger v. City of Fulton*, 605 F. Supp. 3d 432, 452 (N.D.N.Y. 2022) (internal quotation marks omitted) (quoting *Murray v. Miner*, 74 F.3d 402, 405 (2d Cir. 1996)).

"To determine whether two separate entities should be considered a single employer for the purposes of employment discrimination claims, courts have relied on four considerations: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management; and (4) common ownership or financial control." *Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2016) (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)); *see also Stoutenger*, 605 F. Supp. 3d at 452 (discussing factors to be considered).  "The employee satisfies [the integrated enterprise] rule if [he] shows participation by the defendant that is 'sufficient and necessary to the total employment process [of the employer], even absent total control or ultimate authority over hiring decisions.'" *Stoutenger*, 605 F. Supp. 3d at 452

8

(quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000)).  "A crucial element of the inquiry focuses on whether the two enterprises exhibit 'centralized control of labor relations,' including tasks such as handling job applications, approving personnel status reports, and exercising veto power over major employment decisions." *Id.* (quoting *Parker*, 204 F.3d at 341).  "Whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss." *Id.* (internal quotation marks omitted) (quoting *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 226 (2d Cir. 2014)).  However, a plaintiff "must do more than simply state legal conclusions and recite the elements of the 'single employer' standard to survive a motion to dismiss." *Id.* (quoting *Juhua Han v. Kuni's Corp.*, No. 19-CV-6265, 2020 WL 2614726, at *12 (S.D.N.Y. May 22, 2020)).

Plaintiff has sufficiently alleged that Titan and Domsco are a single employer.  He alleges that Titan operates six dealerships, one of which is Hillside Toyota, and Hillside Toyota is directly owned by Domsco.  (SAC ¶ 12.)  He further alleges that: Titan and Domsco share common ownership; Valentino serves as the CEO of both Titan and Domsco and possesses authority to make personnel decisions on behalf of Titan; Amendola possesses authority to make personnel decisions on behalf of both Titan and Domsco; Titan establishes Domsco's policies with respect to personnel decisions; Domsco does not maintain a separate human resources department; Titan regularly shifts employees between Domsco and other dealerships it controls; and Titan holds itself out as the owner of Hillside Toyota, which in turn is owned by Domsco.  (SAC ¶¶ 13–18.)  Plaintiff therefore sufficiently pleads each of the single employer criteria required by the Second Circuit.  *See Griffin*, 835 F.3d at 292.  Accordingly, Plaintiff has sufficiently alleged that Titan and Domsco form a single employer.  *See Donahue v. Asia TV*

*USA Ltd.*, 208 F. Supp. 3d 505, 518 (S.D.N.Y. 2016) (finding that a plaintiff had sufficiently pleaded that two entities formed a "single employer" pursuant to Title VII, the NYSHRL, and NYCHRL where he alleged, inter alia, that a board member from the parent entity visited his employer twice a month and met with employees to review their performance evaluations, as well as approved departmental budgets and expenses, reviewed employee responses to a survey, established policies governing employee duties, and met with several employees to discuss business strategy).

    **c.**   **Title VII and section 1981 claims**

Plaintiff brings hostile work environment and retaliation claims pursuant to Title IV and section 1981 against the Corporate Defendants.  (*See* SAC ¶¶ 73–103.)

    **i.**   **Hostile work environment claims**

Defendants argue that Plaintiff has not stated a claim for hostile work environment since "an allegation of a single isolated comment at a dinner outside of work" does not meet the standard for such a claim.  (Defs.' Mem. 8.)  In support, Defendants contend that the racial slur "was not directed at Plaintiff, or his family" and "was in no way work-related" and that "using the n-word outside of the workplace, in a manner not targeted towards an employee, is [not] actionable as a hostile work environment."  (Defs.' Reply 1–2.)

Plaintiff argues that Defendants "fail to recognize the unique severity generated by Valentino's use of the slur "n****r" and that numerous courts, including the Second Circuit Court of Appeals, have "found a single use of the n-word enough to establish a hostile work environment [claim]."  (Pl.'s Mem. 9–10.)  In addition, Plaintiff argues that "the hostile behavior" to which Defendants subjected him after his complaint, "including invasive scrutiny

10

and detrimental schedule changes, served to heighten the severity of the work environment and erase any doubt that Defendants created a hostile work environment." (*Id.* at 10–11.)

Title VII of the Civil Rights Act of 1964 "prohibits employment-related discrimination on the basis of race, color, religion, sex, or national origin and retaliation against employees who complain about discrimination." *Tassy v. Buttigieg*, 51 F. 4th 521, 429 (2d Cir. 2022) (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008)). A Title VII claimant may establish an employer's liability under the statute by showing either (1) "that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of [a protected characteristic]," or (2) that he was "subjected to harassment on account of one or more [protected characteristics] that amounted to a 'hostile work environment.'" *Id.* (quoting *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004)). To establish a hostile work environment claim under Title VII, a plaintiff must "show that the workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (alteration in original) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)); *see also Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (same). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).

"A hostile work environment is shown when 'a single incident was extraordinarily severe, or . . . a series of incidents were sufficiently continuous and concerted' to be deemed 'pervasive.'" *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 69 (2d Cir. 2023) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). The Second Circuit has not held that "the one-time use of the slur 'n[****]r' by a supervisor to a subordinate can, by itself, support a claim for a hostile work environment." *Daniel v. T&M Prot. Res., LLC*, 689 F. App'x 1, at *2 (2d Cir. 2017); *see also Black v. Buffalo Meat Serv., Inc.*, No. 21-CV-1468, 2022 WL 2902693, at *2 (2d Cir. July 22, 2022) ("We have never held that the onetime use of a racial slur by a supervisor to a subordinate 'by itself, support a claim for a hostile work environment.'" (quoting *Daniel*, 689 F. App'x 1, at *2)); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010) (finding that "a hostile work environment can also be established through evidence of a single incident of harassment that is extraordinarily severe" (internal quotation marks omitted)); *cf.*, *e.g.*, *Albert-Roberts v. GGG Constr., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013) (affirming a district court's determination that a plaintiff's hostile work environment claims based on a co-worker using the word n*****r to plaintiff's husband outside her presence on one occasion and "occasionally moving cleaning supplies to make it difficult for plaintiff to do her job and implying that plaintiff was stealing cleaning supplies" did not "rise to the level of frequency or severity necessary to establish[] [a hostile work environment] claim"). A court should consider the totality of the circumstances and factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance."[3]

---

[3] The Second Circuit has stated that:

*Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018) (quoting *Littlejohn*, 795

F.3d at 320–21); *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). "[W]hen the same

individuals engage in some harassment that is explicitly discriminatory and some that is not, the

entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott

Int'l Inc.*, 952 F.3d 379, 388 (2d Cir. 2020); *see also Daniel*, 689 F. App'x at *3 (remanding with

instructions to consider facially neutral incidents of harassment in analyzing the plaintiff's

hostile work environment claim).  Hostile work environment claims alleged under section 1981

are analyzed under the same framework as those alleged under Title VII.  *See, e.g.*, *Zeng v.

N.Y.C. Hous. Auth.*, No. 22-CV-138, 2023 WL 4553416, at *2 n.2 (2d Cir. July 17, 2023) (citing

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014)).

  To hold an employer liable for a hostile work environment under Title VII, "federal law

requires the plaintiff to show 'a specific basis for imputing the conduct creating the hostile work

environment to the employer.'" *Bentley*, 935 F.3d at 90 (quoting *Summa v. Hofstra Univ.*, 708

F.3d 115, 124 (2d Cir. 2013)).  "Two such bases exist: strict vicarious liability if an employer's

supervisor has created the hostile environment; and negligence if a co-worker who is not a

supervisor has created the environment, and the employer, upon becoming aware of the

misconduct fails to remedy it." *Id.* (first citing *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113

(2d Cir. 2015); and then citing *Summa*, 708 F.3d at 124).

---

    [w]hile the standard for establishing a hostile work environment is
high, we have repeatedly cautioned against setting the bar too high,
noting that [w]hile a mild, isolated incident does not make a work
environment hostile, the test is whether "the harassment is of such
quality or quantity that a reasonable employee would find the
conditions of her employment *altered for the worse.*

*Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (second alteration and emphasis in original)
(quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)).

Plaintiff sufficiently alleges a hostile work environment claim under Title VII and section 1981.[4] Plaintiff alleges that the actions taken against him were motivated by Valentino's and Amendola's race-based animus, and that they occurred over the approximately fifteen-month period following the October 8, 2020 incident. First, Plaintiff alleges that Valentino used the word "n*****r" during a work dinner with Plaintiff and Amendola, and after Plaintiff told him that he was married to a Black woman with whom he had two children, Valentino turned to Amendola and asked "how much is this going to cost me?" before going to the bathroom with Amendola for "approximately fifteen minutes," where, Plaintiff alleges on information and belief, they further discussed the discriminatory remarks and Plaintiff's reaction. (SAC ¶¶ 32–40.) Second, Plaintiff alleges that Amendola subsequently installed security cameras at the workplace, with one of the cameras focused exclusively on Plaintiff's desk, and informed Plaintiff that he was being monitored in this fashion. (*Id.* ¶ 44.) In addition, Plaintiff "was the only employee of Defendants whose desk was exclusively monitored at all times by Amendola," and "nearly half of the television screens depicting the security footage exclusively displayed [Plaintiff's] desk." (*Id.* ¶¶ 44–50.) Moreover, Amendola made sure to point out to Plaintiff that he was taking these actions, and stated that it was his "job to make [Plaintiff] feel uncomfortable," that he knew what "real harassment" looked like, and that he knew "how to be a boss" for Defendants. (*Id.* ¶¶ 46, 48–49.) Third, Plaintiff alleges that Amendola "altered

---

[4] Although Plaintiff does not belong to a "protected class," he may nevertheless bring a discrimination claim based on his association with members of a protected class and Plaintiff alleges "associational discrimination" claims based on his marriage. *See Holcomb v. Iona College*, 521 F.3d 130, 138–39 (2d Cir. 2008) (holding that "an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race"; collecting cases, noting that the "Fifth, Sixth, and Eleventh Circuits agree" and that "[a]ll the district judges in this circuit to consider the question . . . have reached [the same] conclusion").

14

[Plaintiff's] schedule so that he was required to work [outside normal business hours]" until 8:00 PM, — two hours after the business closed to the public — did not alter any other employee's schedule, and did not require any other manager to work outside normal business hours.  (*Id.* ¶¶ 52–55, 57.)  He contends that Amendola made these adverse alterations to his schedule "so that it would be more difficult for [Plaintiff] to continue succeeding in his role with Defendants." (*Id.* ¶ 53.)

Finally, approximately fifteen months after the October 8, 2020 incident, having engaged in the various harassing conduct, Defendants terminated Plaintiff without providing a reason and despite Plaintiff having led them to "drastic growth in gross profit" and performing at or above Defendants' expectations throughout his employment.  (*Id.* ¶¶ 22, 28, 62.)  While only Valentino's use of the word "n****r" is overtly racially discriminatory, Defendants' conduct subsequent to this incident is sufficiently harassing to constitute a hostile work environment. Considering Valentino's racially discriminatory comment along with the "entire course of conduct," *Rasmy*, 952 F.3d at 388, that Amendola and Valentino engaged in — constantly surveilling Plaintiff, forcing him to work outside of normal working hours making him the only employee subjected to this treatment — Plaintiff satisfies his de minimis burden.  *See Daniel*, 689 F. App'x at *3 (vacating the district court's dismissal of sex- and race-based hostile work environment claims because the district court "fail[ed] to include in its analysis some of the complained-of facially neutral incidents of harassment"; noting that plaintiff had alleged "approximately twenty discrete incidents of harassment during his 15-month employment" two of which the Court considered "severe" and one of which involved a supervisor's use of the word n****r); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547–48 (2d Cir. 2010) ("Circumstantial evidence that facially []neutral incidents were part of a pattern of discrimination on the basis of

[a protected characteristic] may consist of evidence that the same individual engaged in multiple acts of harassment, some overtly [discriminatory] and some not." (internal quotation marks omitted)).  Plaintiff's allegations rise to the level that "a reasonable employee would find the conditions of h[is] employment altered for the worse." *Terry*, 336 F.3d at 148 (emphasis and internal quotation marks omitted); *see also, e.g.*, *Cherry v. N.Y.C. Hous. Auth.*, 564 F. Supp. 3d 140, 184 (E.D.N.Y. 2021) (finding plaintiff's hostile work environment claim survived summary judgment where his supervisor's comments that he "[could not] do the job as well as a woman," "did not belong [because he] was a man doing woman's work," and that "a woman could do [his] work faster and better" were considered together with her assigning him "a disproportionately heavy workload" and requiring him to work overtime while denying overtime compensation).

Accordingly, Plaintiff sufficiently alleges that Corporate Defendants are liable for creating a hostile work environment under Title VII and section 1981, based on the severity and pervasiveness of the harassment and the fact that Amendola engaged in the harassing conduct and was Plaintiff's supervisor.  *See E.E.O.C. v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 511 (E.D.N.Y. 2014) ("Where the harasser is a supervisor, an individual 'empowered to take tangible employment actions against the victim,' and 'the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.'" (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013))).  The Court therefore denies Defendants' motion to dismiss Plaintiff's Title VII and section 1981 discrimination claims.

### ii.   Retaliation claims

Defendants argue that Plaintiff has not stated a claim for retaliation since the "causal connection" between his complaints regarding the incident and his termination fifteen months later is too attenuated.  (Defs.' Mem. 10.)  Defendants argue that none of the post-incident

16

occurrences Plaintiff complains of — such as the "video camera installation, which captured his desk among other work areas" and being required to "work[] hours after the store closed to customers" — "raise any inference of discriminatory intent."  (*Id.*)

Plaintiff argues that "Defendants focus entirely on the question of causation" and "overlook[] the series of minor retaliatory acts performed . . . between [Plaintiff's] initial complaint and termination, such as forcing him to work outside of normal working hours and filming his every move, which extend the period necessary to show intent by timing."  (Pl.'s Mem. 12.)  In addition, Plaintiff argues "Amendola's response to [his] complaint directly evinced a retaliatory intent," and that Amendola's comments that he "knew what 'real harassment' looked like and that it was '[Amendola's] job to make [Plaintiff] feel uncomfortable,'" when "combined with dismissal of complaints of discrimination" are sufficient to show an inference of retaliation.  (*Id.* at 13.)

Title VII prohibits retaliation against an employee who "has opposed any practice [that is] made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e-3(a); *Green v. Mount Sinai Health Sys., Inc.*, 826 F. App'x 124, 125 (2d Cir. 2020) ("Title VII prohibits employers from retaliating against any employee because that individual has opposed any practice made unlawful by Title VII." (internal quotation marks omitted) (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015))).  Title VII retaliation claims are evaluated using the *McDonnell Douglas* burden-shifting framework.  *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 178 (2d Cir. 2023); *Russell v. N.Y. Univ.*, 739 F. App'x 28, 32 (2d Cir. 2018) (citing *Duplan*, 888 F.3d at 625).  Under the framework, the plaintiff must first establish "a *prima facie* case of retaliation."  *Russell*, 739 F. App'x at 32 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show:

"(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 315–16 (internal quotation marks omitted) (quoting *Hicks*, 593 F.3d at 164). If the plaintiff sustains this initial "*de minimis*" burden, *Duplan*, 888 F.3d at 626, a "presumption of retaliation" arises and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action," *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Hicks*, 593 F.3d at 164). "If the defendant does so, then the burden shifts back to the plaintiff[] . . . [to] show that the reason offered by the employer is merely pretext, and that the employer's 'desire to retaliate' was the actual 'but-for cause of the challenged employment action.'" *Id.* (quoting *Ya-Chen Chen*, 805 F.3d at 70). "But-for causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan*, 888 F.3d at 625 (internal quotation marks omitted). Section 1981 retaliation claims are analyzed under the same framework as those alleged under Title VII. *See, e.g.*, *Hicks*, 593 F.3d at 164 (analyzing a plaintiff's Title VII and section 1981 claims together since "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981" (internal quotation marks omitted) (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004))).

### 1.   Participation in a protected activity and Defendant's knowledge

Plaintiff has sufficiently alleged that he engaged in protected activity known to Defendants. First, Plaintiff alleges that immediately after Valentino made the racist remark at

the October 8, 2020 dinner, he "reminded Valentino that his wife and kids were black and that he took offense to Valentino's unconscionably racist remark."  (SAC ¶ 35.)  Plaintiff also alleges that the following day, October 9, 2020, he "complained to Amendola regarding Valentino's racist remark," (*Id.* ¶ 41), but Amendola brushed off his complaint with the statement: "oh, you know, [Valentino] is an old-fashioned guy, that's why . . . ."  (*Id.* ¶ 42).  Second, Plaintiff alleges that Defendants knew that he had taken part in protected activity based on his complaint to Valentino about Valentino's use of the racial slur at the October 8, 2020 dinner, (*Id.* ¶ 35), and his complaint to Amendola the following day, (*id.* ¶ 41).  Such complaints constitute protected activity under Title VII and section 1981.  *See, e.g.*, *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (noting that "protected activity includes "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges"); *Littlejohn*, 795 F.3d at 317 (same); *Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 442 (S.D.N.Y. 2019) (same); *Ndongo v. Bank of China Ltd.*, No. 22-CV-5896, 2023 WL 2215261, at *2 (S.D.N.Y. Feb. 24, 2023) (finding plaintiff's complaint to a manager about "his discriminatory comments" constituted protected activity).

### 2.   Adverse employment action

Plaintiff has sufficiently alleged that he was subject to "adverse employment actions" for purposes of Title VII and section 1981.  Plaintiff alleges that throughout the fifteen months after his complaints to Valentino and Amendola, Defendants took several adverse employment actions against him including (1) installing video surveillance focused on Plaintiff, targeting Plaintiff exclusively for full-time surveillance, and making intimidating comments such as it being

Amendola's job to "make [Plaintiff] feel uncomfortable" and that Amendola knew what "real harassment" looked like and "how to be a boss" for Defendants, (2) assigning Plaintiff to work outside of normal hours, and (3) terminating Plaintiff without explanation despite him having led them to "drastic growth in gross profit." (SAC ¶¶ 22, 28, 44–50, 52–55.)

Adverse employment actions are actions that "could well have dissuaded a reasonable employee in [the plaintiff's] position from complaining of unlawful discrimination [or conduct prohibited by Title VII]." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (first quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006); and then citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)); *see also Rivera v. JP Morgan Chase*, 815 F. App'x 603, 608 (2d Cir. 2020) (affirming that an adverse employment action for Title VII retaliation purposes is "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination," and that standard "covers a broader range of conduct than the adverse-action standard for claims of discrimination" (internal quotation marks omitted)); *O'Toole v. County of Orange*, 255 F. Supp. 3d 433, 442 (S.D.N.Y. 2017) ("Defendant's conduct, considered as a whole, meets the 'objective' standard, as the 'employment consequences of a negative nature' resulting from making a complaint could chill other employees from speaking up." (quoting *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014))). "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks*, 593 F.3d at 165 (citing *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

### A.   Video surveillance

Plaintiff sufficiently alleges that Defendants' video surveillance of him constituted an adverse employment action by alleging that he was constantly surveilled, he was the only employee subjected to such surveillance, and the surveillance began after he complained about Valentino's use of a racial slur.  Although Defendants characterize Plaintiff's allegations as complaints that "one of the company's video cameras captured [Plaintiff's] desk," (Defs.' Mem. 10), Plaintiff alleges that "after the racist remark, Amendola installed security cameras at Hillside Toyota, one of which exclusively focused on [Plaintiff's] desk," (SAC ¶ 44), that Amendola then called Plaintiff into his office to notify him about "the screen that exclusively focused on Plaintiff's desk" and when Plaintiff complained about the constant surveillance, replied: "[I]t's my job to make you feel uncomfortable," and further stated that that he knew what "real harassment" looked like and knew "how to be a boss" for Defendants.  (*Id.* ¶¶ 44, 46, 48, 49.)  Plaintiff further alleges that at the time of this exchange between himself and Amendola, "nearly half of the television screen depicting the security footage exclusively displayed Plaintiff's desk," and that only Plaintiff's desk was "exclusively monitored at all times by . . . the newly installed security cameras."  (*Id.* ¶¶ 47, 50.)  The type and level of surveillance that Plaintiff alleges could "dissuade[] a reasonable employee . . . from complaining of unlawful discrimination," *Davis-Garett*, 921 F.3d at 44 (internal quotation marks omitted) (quoting *Kessler*, 461 F.3d at 209), and therefore constitutes an adverse employment action.  *See Bind v. City of New York*, No. 08-CV-11105, 2011 WL 4542897, at *16 (S.D.N.Y. Sept. 30, 2011) (finding that although the plaintiff did not know she was being surveilled, "surveillance can still constitute an adverse employment action"); *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 597–99, 607 (S.D.N.Y. Sept. 29, 2010) (denying defendant's motion

for judgment as a matter of law as to the plaintiff's retaliation claim; upholding a jury verdict finding that the defendant retaliated against plaintiff by surveilling him with a hidden camera; concluding that there was "nothing unreasonable about the jury's concluding that secret surveillance by an employer well might . . . dissuade a reasonable employee from continuing to complain about discrimination — especially in the context of the apparent lack of a sympathetic response from management to complaints").

## B.   Change of schedule

Plaintiff sufficiently alleges that Defendants' changes to his schedule constituted an adverse employment action.  Plaintiff alleges that after he complained about Valentino's use of a racial slur, Amendola altered Plaintiff's work schedule so that he was required to work when the dealership was closed to the public.  (SAC ¶¶ 51–52.)  Plaintiff further alleges that Amendola did not similarly alter any other employee's schedule, did not require any other manager to work outside normal operating hours, and when Plaintiff complained about the changes and asked why he was the only manager required to work until 8:00 PM, Amendola responded, "Because I can." (*Id.* ¶¶ 54, 55, 57.)  These negative changes to Plaintiff's schedule made it "more difficult for [Plaintiff] to continue succeeding in his role with Defendants" and the changes remained in place until Plaintiff's termination.  (*Id.* ¶¶ 53, 58.)  Plaintiff therefore alleges that Defendants made adverse changes to his schedule, that they gave no reason for doing so and refused to alter his schedule even after he complained, that the changes made it more difficult for him to successfully do his job, that and that Defendants did not make comparable changes to any other employee's schedule.  The adverse schedule change and the circumstances under which they were implemented, eventually resulting in Plaintiff's termination, could "dissuade[] a reasonable employee . . . from complaining of unlawful discrimination," *Davis-Garett*, 921 F.3d at 44, and

therefore constitute an adverse employment action.  *See Brown v. City Univ. of N.Y.*, No. 21-CV-854, 2022 WL 4637818, at *17 (E.D.N.Y. Sept. 30, 2022) (implementing negative changes to plaintiff's work schedule was an adverse employment action sufficient to support plaintiff's Title VII retaliation claim since it was "'harmful to the point that it could well dissuade a reasonable worker' from continuing to complain" (quoting *Vogel v. CA, Inc.*, 662 F. App'x 72, 76 (2d Cir. 2016))).

### C.   Termination

Defendants' termination of Plaintiff constitutes an adverse employment action.  *See, e.g.*, *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (noting that "[e]mployment actions that we have 'deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment'" (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004))).

### 3.   Causal connection

To sufficiently plead that a defendant-employer took an adverse employment action "because" a plaintiff opposed an unlawful employment practice, a plaintiff "must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action."  *Vega*, 801 F.3d at 90 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).  But-for causation does not require that retaliation "was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* at 91 (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

A causal connection of retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar

conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (internal quotation marks omitted) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (same); *see also Terry*, 336 F.3d at 152 ("Proof of such a causal connection 'can be established "directly through evidence of retaliatory animus directed against a plaintiff," or "indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . such as disparate treatment of fellow employees who engaged in similar conduct."'" (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir. 1999), *abrogated on other grounds by White*, 548 U.S. 53 (2006))).

"[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." *Feingold*, 366 F.3d at 156–57 (collecting cases); *see also Vega*, 801 F.3d at 90 ("A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." (first citing *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001); and then citing *Gorzynski*, 596 F.3d at 110)); *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015) ("Ordinarily, causation may be inferred from close temporal proximity."). The Second Circuit has not defined "the outer limits beyond which a temporal relationship is too attenuated to establish causation." *See Gorzynski*, 596 F.3d at 110–11 ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship."). A gap of seven months between a protected activity and an alleged retaliatory act can be "sufficient to infer causation." *Summa*, 708 F.3d at 128–29. "Eleven months is, to say the least, at the very outer limit of the amount of time that is

considered sufficient to establish causation," *Cronin v. St. Lawrence*, No. 08-CV-6346, 2009 WL 2391861, at *5 (S.D.N.Y. Aug. 5, 2009), but a gap of twenty months "suggests, by itself, no causality at all," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001).

Plaintiff sufficiently alleges a causal connection between the protected activity and the adverse employment actions.  Plaintiff alleges "after the racist remark, Amendola installed security cameras at Hillside Toyota, one of which exclusively focused on Kekovic's desk." (SAC ¶ 44.)  He alleges that "[a]lmost immediately after dismissing Plaintiff's complaint" about Valentino's use of a racial slur, "Amendola told Plaintiff that he (Amendola) knew what 'real harassment' looked like and that it was '[his] job to make [Plaintiff] feel uncomfortable' in response to Plaintiff's complaints about being constantly surveilled.  (Pl.'s Mem. 13.)  Plaintiff thus alleges that Defendants took an adverse employment action against him — subjecting him to round the clock surveillance — "[a]lmost immediately after" he engaged in protected activity. This close temporal proximity between Plaintiff's protected activity and Defendants' adverse employment action is sufficient to meet Plaintiff's de minimis burden of showing causation.  *See Rivera*, 815 F. App'x at 608 (collecting cases finding close temporal proximity between protected activity and adverse employment action sufficient to establish causal connection); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (finding gap of five months potentially supportive of prima facie case of retaliation); *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) (finding gap of four months supportive of prima facie case of retaliation).

In addition, Plaintiff's allegations regarding the adverse changes to his work schedule also demonstrate sufficient "temporal proximity" to his protected activity to meet his de minimis burden of alleging causation.  Plaintiff alleges that "in or around April 2021" — between five

and six months after Plaintiff engaged in protected activity — Amendola "materially alter[ed] his work schedule" so that he was required to work outside regular business hours and did not alter the schedule of any other employee.  (SAC ¶¶ 51–53.)  Five-and-a-half months is not outside the bounds of what the Circuit has found sufficient to allege a causal connection between protected activity and an adverse employment action.  *See Summa*, 708 F.3d at 128–29 ("[W]e have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.  This has allowed our Court to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." (internal quotation marks omitted) (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (comparing *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir. 1990) (finding insufficient evidence that a three month gap constituted temporal proximity) with *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (finding that an eight month gap indicated a causal connection)))).  This Court and other courts in this Circuit have previously found that gaps of five-and-a-half months and longer were sufficient to demonstrate causation.  *See Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2018 WL 4259866, at *20 (E.D.N.Y. Sept. 5, 2018) (six-month gap was "sufficient to establish temporal proximity"); *see also Canales v. ACP Facility Servs., Inc.*, No. 17-CV-6937, 2019 WL 1171479, at *5 (E.D.N.Y. Mar. 13, 2019) (finding that a plaintiff who alleged that she was written up five-and-a-half months after the alleged protected activity and terminated four months thereafter had sufficiently alleged causation since she protected activity occurred "less than six months before the date of the first retaliatory action").

Drawing all inferences in Plaintiff's favor, the Court finds that Plaintiff has met his de minimis burden to allege a causal connection between his protected activity and Defendants' adverse employment actions, and the Court therefore denies Defendants' motion to dismiss Plaintiff's Title VII and section 1981 retaliation claims.  *See Brown*, 2022 WL 4637818, at *17 (denying defendant's motion to dismiss Title VII retaliation claims based on her allegation that defendant made adverse changes to her schedule seven months after she engaged in protected activity); *see also Vega*, 801 F.3d at 84 (noting that a Title VII plaintiff need only plead facts sufficient to give "plausible support" to the plaintiff's "minimal" initial burden (quoting *Littlejohn*, 795 F.3d at 311)).

### d.   NYSHRL and NYCHRL claims

Plaintiff alleges hostile work environment and retaliation claims against all Defendants pursuant to the NYSHRL and NYCHRL, based on the same allegations he made in support of his Title VII and section 1981 claims.  (SAC ¶¶ 104–23.)

Because the Court finds that Plaintiff's Title VII and section 1981 hostile work environment and retaliation claims survive Defendants' motion to dismiss, and in view of the fact that the NYSHRL[5]  and NYCHRL apply a more lenient standard than their federal

---

[5]  Historically, claims under the NYSHRL were "largely subject to the same analysis [courts] apply under Title VII."  *Reyes v. Westchester Cnty. Health Care Corp.*, No. 21-CV-0410, 2021 WL 4944285, at *2 (2d Cir. Oct. 25, 2021) (citing *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014)).  However, "the NYSHRL was amended in 2019 to 'be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed.'"  *Cooper v. Franklin Templeton Invs.*, No. 22-CV-2763, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023) (quoting N.Y. Exec. L. § 300).  "New York courts have not yet produced any substantive analysis of how this amendment changes standards of liability under the NYSHRL," but some courts in this Circuit "have interpreted the amendment as rendering the standard for claims closer to the standard of the NYCHRL."  *Id.* (internal quotation marks and citation omitted).  The Second Circuit has not yet "resolve[d] the

counterparts, the Court denies Defendants' motion to dismiss as to Plaintiff's NYSHRL and NYCHRL hostile work environment and retaliation claims.

### e.    Plaintiff's tortious interference with prospective economic advantage claim

Defendants argue that Plaintiff fails to state a claim for tortious interference with prospective economic advantage because he fails to allege "what the false information might have included or what wrongful purpose or dishonest, unfair, or improper means may have been involved." (Defs.' Mem. 13.)

Plaintiff argues that he has stated a claim because he "expressly identified Plaza Auto Mall" as the third party with whom he had business relations. (Pl.'s Mem. 14.)

"To prevail on a claim for tortious interference with business relations under New York law, 'a plaintiff must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'" *Pride Techs., LLC v. Khublall*, No. 21-CV-2225, 2022 WL 17587755, at *1 (2d Cir. Dec. 13, 2022) (quoting *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015)); [6] *See also Fika Midwifery PLLC v. Independent Health Assn., Inc.*, 173 N.Y.S.3d 761, 765 (App.

---

impact of these amendments." *Id.* The amendments apply to Plaintiff's claims because his claims accrued after October 11, 2019. *See Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019). Because the Court finds Plaintiff has alleged discrimination and retaliation claims under Title VII's more stringent standard, the Court does not need to resolve the effect of the amendments. *Cooper*, 2023 WL 3882977 (declining to "resolve the impact of the[] amendments . . . because [the Court] conclude[s] that [plaintiff's] employment discrimination claim falls short even under the NYCHRL's more liberal standards").

[6] A claim for tortious interference with prospective economic advantage is identical to a claim of tortious interference with business relations. *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (noting that tortious interference with business relations is "also known as tortious interference with prospective economic advantage").

Div. 2022) (identifying the same four requirements) (quoting *Amaranth LLC v J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 494 (App. Div. 2009)).

To state a claim for interference with prospective business relations under New York law, a defendant must have engaged in "conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004). New York courts have placed some limits on what constitutes "business relations" by rejecting, for example, a claim containing "only a general allegation of interference with customers without any sufficiently particular allegation of interference with a specific . . . business relationship." *16 Casa Duse, LLC*, 791 F.3d at 262 (quoting *McGill v. Parker*, 582 N.Y.S.2d 91, 95 (App. Div. 1992)). "[T]he plaintiff must allege a specific business relationship with an identified third party with which the defendants interfered." *Mehrhof v. Monroe-Woodbury Cent. Sch. Dist.*, 91 N.Y.S.3d 503, 505 (App. Div. 2019) (first citing *N.Y. Tile Wholesale Corp. v. Thomas Fatato Realty Corp.*, 61 N.Y.S.3d 136 (App. Div. 2017); then citing *Bus. Networks of N.Y., Inc. v. Complete Network Sols., Inc.*, 696 N.Y.S.2d 433 (App. Div. 1999); and then citing *Burns Jackson Miller Summit & Spitzer v. Lindner*, 452 N.Y.S.2d 80 (App. Div. 1982)).

In addition, "[t]he New York Court of Appeals has explained that, 'as a general rule, a defendant's conduct must amount to a crime or an independent tort' in order to amount to tortious interference with a prospective economic advantage." *Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009) (quoting *Carvel Corp.*, 3 N.Y.3d at 190). "A defendant who has not committed a crime or independent tort or acted solely out of malice may nevertheless be liable if he has employed 'wrongful means,'" which include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions" and "extreme and unfair

29

economic pressure." *Id.* (first quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183 (1980); and then quoting *Carvel Corp.*, 3 N.Y.3d at 190). If the defendant's "motive in interfering . . . was normal economic self-interest," the defendant did not use unlawful means. *Carvel Corp.*, 3 N.Y.3d at 190.

Plaintiff fails to allege a claim for tortious interference with prospective economic advantage. Plaintiff has not alleged any criminal or tortious conduct by Defendants, and has not alleged any physical violence, civil suits or criminal prosecutions, or economic pressure. *See Friedman*, 321 F. App'x at 60. Instead, Plaintiff bases his claim on the "fraud or misrepresentation" exception to the requirement that he allege a crime or tort. *See id.* Plaintiff alleges that following his termination, Valentino (1) "interfered with [Plaintiff's] ability to obtain new employment by calling local dealerships and providing false information in an attempt to 'blackball' him from the industry," and (2) that "in April 2022, Plaintiff arranged to meet with the General Manager of Plaza Auto Mall . . . to discuss his potential employment" but that before the meeting Valentino spoke with the General Manager and "provided him with false information about Plaintiff" which led to the meeting being cancelled. (SAC ¶¶ 65–66.) Plaintiff's allegation that Valentino provided the General Manager of Plaza Auto Mall with "false information about Plaintiff" is insufficient to satisfy the "fraud or misrepresentation" requirement since he does not provide any details of what Valentino said or what facts he misrepresented to the General Manager of Plaza Auto Mall. Without more specific allegations, the conclusory statement that a defendant provided "false information," (*id.* ¶ 65), does not rise to the level of "wrongful means," *16 Casa Duse, LLC*, 791 F. 3d at 262; *see also, e.g.*, *Camelot SI, LLC v. ThreeSixty Brands Grp. LLC*, 632 F.Supp.3d 471, 484 (S.D.N.Y. 2022) (finding that "misrepresentations to consumers" was not "enough to establish interference through wrongful

30

purpose"); *Global Packaging Servs., LLC v. Global Printing & Packaging*, 248 F. Supp. 3d 487, 495 (S.D.N.Y. 2017) (dismissing plaintiff's claims that defendant falsely informed clients that it would be replacing plaintiff as their representative and they should therefore no longer do business with plaintiff"); *Whipple v. Reed Eye Assocs.*, 213 F. Supp. 3d 492, 497 (W.D.N.Y. 2016) (finding no claim alleged where the plaintiff alleged that her former employer warned a prospective employer against hiring her); *Fifth Street Fin. Corp. v. Toll*, No. 12-CV-5896, 2013 WL 3757037, at *4 (S.D.N.Y. July 17, 2013) (finding that the plaintiff must state the alleged misrepresentations in order to state a claim); *see also Carvel*, 3 N.Y.3d at 191 (noting that "wrongful means" does not include "persuasion alone" even if it is "knowingly directed at interference").

Accordingly, the Court grants Defendants' motion and dismisses Plaintiff's claim for tortious interference with prospective economic advantage.

### f.   Plaintiff's request to file a third amended complaint

On January 12, 2023, Plaintiff sought leave to file a Third Amended Complaint ("TAC") pursuant to Rule 15 of the Federal Rules of Civil Procedure.  (*See* Pl.'s Mot. for a Pre-Mot. Conference, Docket Entry No. 28; Pl.'s Proposed TAC, Docket Entry No. 28-1.)  Plaintiff's proposed TAC supplements the SAC with allegations regarding communications between the parties' counsel and a lawsuit Defendants filed against Plaintiff in state court in December of 2022 raising claims of defamation and intentional infliction of emotional distress.

Defendants oppose the motion.  (*See* Defs.' Letter in Opp'n to Pl.'s Req. for a Pre-Mot. Conference, Docket Entry No. 31.)  They argue that after Plaintiff commenced this action, he "made various defamatory postings on the Internet, in various text messages sent to current and former employees of Plaintiffs, and in his email communications sent to Defendant[s'] franchise

Regional Manager." (*Id.* at 1.)  Defendants argue that the state court lawsuit is "a legitimate, good faith litigation caused by separate, independent, repeated affirmative acts undertaken by [Plaintiff]."[7] (*Id.* at 2.)

Under Rule 15(a) of the Federal Rules of Civil Procedure, district courts should "'freely give' leave to amend [a complaint] 'when justice so requires.'" *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015) (quoting Fed. R. Civ. P. 15(a)(2)); *see also Johnson v. Precythe*, 141 S. Ct. 1622, 1626 (2021) (Sotomayor, J. dissenting) (Rule 15(a) "reflects the principle that the purpose of pleading is to facilitate a proper decision on the merits.  If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." (internal quotation marks omitted) (quoting *Foman v. Davis*, 371 U.S. 178 (1962))); *Kainz v. Bernstein*, 841 F. App'x 249, 253 (2d Cir. 2020) (citation omitted) (noting that leave to amend should be freely given); *Bornholdt v. Brady*, 869 F.2d 57, 68 (2d Cir. 1989).  If the proposed amended complaint includes allegations about events that occurred after the original complaint was filed, Rule 15(d) rather than Rule 15(a) applies.  *See Shubert v. Town of Glastonbury*, No. 18-CV-112, 2020 WL 6395472, at *1 (D. Conn. Nov. 2, 2020) ("Although the plaintiff's motion is styled as a 'motion for leave to amend' and invokes Rule 15(a)(2), it is more properly considered as a motion to supplement the complaint under Rule 15(d) because it seeks to add factual allegations about events postdating the complaint.").  The same substantive standard applies when analyzing a motion under Rules 15(d) and 15(a).  *See Porter v. MooreGroup Corp.*, No. 17-CV-7405, 2020 WL 32434, at *8

---

[7] On January 28, 2023, the Court informed the parties that it would consider Plaintiff's motion to file a TAC at the same time it considers Plaintiff's motion to dismiss, and permitted the parties to submit additional briefing on the issue.  (Order dated Jan. 28, 2023.)

(E.D.N.Y. Jan. 2, 2020) ("[T]he substantive analysis under Rules 15(a) and 15(d) is the same.");
*see also Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995) (citing *Foman*, 371 U.S. at
182, which sets forth standards for amending under Rule 15(a), to support the proposition that
motions for leave to amend under Rule 15(d) "should be freely granted").

The Court grants Plaintiff's request to amend the SAC pursuant to Rule 15(d) of the
Federal Rules of Civil Procedure. Plaintiff's proposed changes to the SAC relate exclusively to
Defendants' filing of a state court lawsuit in December of 2022 and therefore relate to events that
post-date the filing of the original complaint. *See Shubert*, 2020 WL 6395472, at *1 ("Although
the plaintiff's motion is styled as a 'motion for leave to amend' and invokes Rule 15(a)(2), it is
more properly considered as a motion to supplement the complaint under Rule 15(d) because it
seeks to add factual allegations about events postdating the complaint."). Moreover, Defendants
do not state how, if at all, they would be prejudiced by the proposed TAC. The proposed
changes affect only Plaintiff's retaliation claims pursuant to Title VII, section 1981, the
NYSHRL, and the NYCHRL, and, as discussed above, Plaintiff's allegations sufficiently state
these claims. Plaintiff's proposed TAC therefore does not affect the outcome of the motion
currently before the Court, and the Court finds that "supplementation will promote the economic
and speedy disposition of the controversy between the parties," will not "cause undue delay or
trial inconvenience," and will not prejudice Defendants. *Bornholdt*, 869 F.2d at 68.

Plaintiff is directed to file the proposed TAC attached as Exhibit 1 to his January 12,
2023 motion as a separate docket entry within seven days of this Memorandum and Order. The
TAC will supersede the SAC and serve as the operative complaint. *See Wertzberger v. Shapiro*,
No. 19-CV-4272, 2021 WL 327619 (E.D.N.Y. Feb. 1, 2021) (allowing a plaintiff to amend a

complaint with events that took place after plaintiff filed the complaint and denying defendant's motion to strike plaintiff's proposed changes).

## III.  Conclusion

For the reasons stated above, the Court (1) denies Defendants' motion to dismiss as to Plaintiff's discrimination and retaliation claims, (2) grants Defendants' motion as to Plaintiff's tortious interference with prospective economic advantage claim, and (3) grants Plaintiff's request to file a TAC and directs him to file his amended pleading within seven days of this Memorandum and Order.

Dated: September 29, 2023
      Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

34