UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
SINISA KEKOVIC *also known as* SASHA
KEKOVIC,

                            Plaintiff,                    **MEMORANDUM & ORDER**
                                                          22-CV-2142 (MKB)

                    v.

TITAN MOTOR GROUP LLC, DOMSCO
MOTORS LLC, JOSEPH VALENTINO, and
SALVATORE AMENDOLA,

                            Defendants.
-----------------------------------------------------------------
MARGO K. BRODIE, United States District Judge:

    Plaintiff Sinisa Kekovic, also known as Sasha Kekovic, commenced the above-captioned

action on April 13, 2022 against Titan Motor Group LLC ("Titan"), Domsco Motors LLC

("Domsco") (collectively, the "Corporate Defendants"), and against Joseph Valentino and

Salvatore Amendola (collectively, the "Individual Defendants").  (Compl., Docket Entry No. 1;

Third Amended Complaint ("TAC"), Docket Entry No. 36.)[1]  Plaintiff alleges against the

Corporate Defendants hostile work environment and retaliation claims in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); Section 1981 of the Civil

Rights Act of 1866, 42 U.S.C. § 1981 ("section 1981"); and against all Defendants, hostile work

environment and retaliation claims in violation of the New York State Human Rights Law, New

York Executive Law § 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law,

---

[1]  Plaintiff filed a First Amended Complaint ("FAC") on September 15, 2022, a Second
Amended Complaint ("SAC") on November 3, 2022, and a Third Amended Complaint ("TAC")
on October 3, 2023.  (*See* FAC, Docket Entry No. 15; SAC, Docket Entry No. 20; TAC, Docket
Entry No. 36.)

New York City Administrative Code § 8-107(1) *et seq*. ("NYCHRL"); and a claim for tortious interference with prospective economic advantage in violation of New York common law.  (TAC ¶¶ 80–134.)  Plaintiff alleges that Valentino and Amendola used a racial slur and after he complained about it, they engaged in discriminatory and retaliatory actions against him.  (*Id.* ¶¶ 34–79.)

Currently before the Court is Defendants' motion for summary judgment on Plaintiff's hostile work environment and retaliation claims;[2] Plaintiff opposes the motion.[3]  For the reasons set forth below, the Court denies Defendants' motion for summary judgment.[4]

---

[2]  On November 23, 2022, Defendants moved to dismiss all claims for failure to state a claim.  (Defs.' Mot. to Dismiss, Docket Entry No. 25.)  On September 29, 2023, the Court denied Defendants' motion to dismiss Plaintiff's discrimination and retaliation claims and granted Defendants' motion to dismiss Plaintiff's claim for tortious interference with prospective economic advantage (the "September 2023 Decision").  (Sept. 2023 Decision, Docket Entry No. 35); *Kekovic v. Titan Motor Grp. LLC*, No. 22-CV-2142, 2023 WL 6385712, at *1 (E.D.N.Y. Sept. 29, 2023).  Plaintiff renewed all of his claims against the Defendants in the TAC.  (*See* TAC.)

[3]  (Defs.' Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 58; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 62; Decl. of Salvatore Amendola in Supp. of Defs.' Mot. ("Amendola Decl."), Docket Entry No. 60; Decl. of Rachel Schulman, Esq. in Supp. of Defs.' Mot. ("Schulman Decl."), Docket Entry No. 61; Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), Docket Entry No. 68; Decl. of Joseph Myers in Supp. of Pl.'s Opp'n ("Myers Decl."), Docket Entry No. 65; Decl. of Marjorie Mesidor in Supp. of Pl.'s Opp'n ("Mesidor Decl."), Docket Entry No. 66; Decl. of Sinisa Kekovic in Supp. of Pl.'s Opp'n ("Kekovic Decl."), Docket Entry No. 69; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 64.)

[4]  Defendants correctly note that the Court's September 2023 Decision "granted Defendants' motion to dismiss Count IX," Plaintiff's claim for tortious interference with prospective economic advantage.  (Defs.' Mem. 2.)  However, consistent with the Court's leave to amend, Plaintiff filed the TAC four days later and renewed his claim for tortious interference with prospective economic advantage.  (Sept. 2023 Decision; TAC ¶¶ 131–34.)  Defendants do not move for summary judgment on Plaintiff's common law claim and the Court accordingly does not address that claim.

## I.    Background

The following facts are undisputed unless otherwise noted.[5]

### a.    The parties

Titan is a limited liability company that "brands" car dealerships.  (Dep. of Joseph Valentino ("Defs.' Valentino Tr.") 9:6–9, annexed to Schulman Decl. as Ex. C, Docket Entry No. 61-3.)  Titan and Domsco share common ownership.  (Answer to TAC ¶ 14, Docket Entry No. 39.)  Domsco is a car dealership operating as Hillside Toyota.  (Pl.'s 56.1 Resp. ¶ 22.)

Plaintiff was General Sales Manager at Hillside Toyota from February 18, 2019 to January 20, 2022.  (*Id.*)  Valentino is the Chief Operating Officer of Titan.  (Defs.' Valentino Tr. 9:2–5.)  Amendola is the General Manager of Hillside Toyota and has been supervised by Valentino for approximately fourteen years.  (Dep. of Salvatore Amendola ("Defs.' Amendola Tr.") 9:8–21, 171:14–15, annexed to Schulman Decl. as Ex. D, Docket Entry No. 61-4; *see also* Answer to TAC ¶ 19.)  Amendola supervised Plaintiff throughout his employment with Defendants.  (Answer to TAC ¶ 19.)

### b.    The October 8, 2020 Opus Steakhouse dinner

On or about October 8, 2020, Valentino and Amendola invited Plaintiff to dinner at Opus Steakhouse.  (Pl.'s 56.1 Resp. ¶ 58.)  The parties dispute whether Valentino and Amendola

---

[5]    (Defs.' 56.1 Stmt. ("Defs.' 56.1"), Docket Entry No. 59; Pl.'s Resp. to Defs.' 56.1 ("Pl.'s 56.1 Resp."), Docket Entry No. 67.)  The parties' respective statements provide an incomplete summary of relevant facts, and both parties only submitted short excerpts of deposition testimony.  The Court accordingly relies on the allegations in the TAC and the Defendants' Answer to provide necessary background details.  *See Gorman v. Rensselaer Cnty.*, No. 14-CV-434, 2017 WL 1133392, at *1 n.1 (N.D.N.Y. Mar. 24, 2017) ("Because the parties' statements of material facts give an incomplete picture of the events in this case, the Court draws on the Second Amended Complaint to provide relevant background."), *aff'd*, 910 F.3d 40 (2d Cir. 2018).

3

initiated the dinner as a celebration of Plaintiff's work achievements.  (Answer to TAC ¶¶ 28–30.)

The parties also dispute whether the following conversation took place at the dinner. Plaintiff testified that at the dinner at Opus Steakhouse Valentino asked him, "How do you like this restaurant?" and that he responded, "I really love it.  I appreciate it."  (Dep. of Sinisa Kekovic ("Pl.'s Kekovic Tr.") 129:6–10, annexed to Myers Decl. as Ex. A, Docket Entry No. 65-1.)  Valentino then asked Plaintiff what he liked about the restaurant, and Plaintiff responded, "I like everything about it.  It's a beautiful place.  Thank you so much."  (*Id.* 129:11–15.) Valentino then commented, "Well, there's only one thing here.  There's no n****rs here."  (Pl.'s Kekovic Tr. 129:16–22,; Pl.s' 56.1 Resp. ¶ 59.)  Plaintiff responded, "What do you mean by that?" and Valentino repeated, "Well, there's no n****rs here."  (Pl.'s Kekovic Tr. 129:16–22.) Plaintiff replied, "What do you mean about n****rs?  Don't you understand my wife is Black, and my kids are Black?  Why would you say that?"[6]  (*Id.* 129:23–130:2.)  Valentino turned to Amendola and said, "Sal, I wonder how much this is going to cost me," and Plaintiff said, "What you need to do, you need to apologize for what you just said.  You know my wife is Black.  Why would you say that?"  (*Id.* 130:10–17.)  No one spoke for a few minutes, and Valentino and Amendola went to the bathroom for approximately fifteen minutes.  (*Id.* 130:18–131:2.)  The parties subsequently finished dinner and Valentino departed first.  (*Id.* 136:2–9.)  Plaintiff asked Amendola, "Why would [Valentino] say that to me?" and Amendola responded, "Just leave it alone.  Just forget about it."  (*Id.* 136:10–14.)  Plaintiff responded, "I don't think I'm going to forget about it. . . .  This is not right, man.  I work with you people."  (*Id.* 136:15–19.)  At 6:29

---

[6] Plaintiff is a white male who is married to a Black woman, and he shares two children with his ex-wife, who is also Black.  (Pl.'s 56.1 Resp. ¶¶ 1, 3–5.)

PM on the night of the dinner, Plaintiff texted Valentino and Amendola individually with videos of the steak carving at the dinner.[7]  In his message to Valentino, Plaintiff wrote, "Thank you great dinner."  (Pl.'s 56.1 Resp. ¶ 63; Kekovic Text Messages with Valentino.)  Valentino responded, "Anytime thank you."  (Pl.'s 56.1 Resp. ¶ 64; Kekovic Text Messages with Valentino.)  At 7:40 PM, Plaintiff also texted Amendola, "12 ups 8 sold 4 del new 14256 used 5100.  O well when I'm not there no $."  (Pl.'s 56.1 Resp. ¶ 65; Kekovic Text Messages with Amendola.)

Amendola testified that he did not recall anything Valentino said at the October 8, 2020 dinner, or any topic of conversation at the dinner.  (Dep. of Salvatore Amendola ("Pl.'s Amendola Tr.") 83:6–18, 87:5–24, annexed to Myers Decl. as Ex. B, Docket Entry No. 65-2; Pl.'s 56.1 Resp. ¶ 61.)  Valentino likewise testified that he did not recall the conversation or anything that happened at the dinner.  (Dep. of Joseph Valentino ("Pl.'s Valentino Tr.") 33:12–25, annexed to Myers Decl. as Ex. C, Docket Entry No. 65-3; Pl.'s 56.1 Resp. ¶ 60.)  Valentino testified that "n****r" is not "in [his] vocabulary," and he "never would have said it," but that he does not "recall the conversation" at the October 8, 2020 dinner.  (Defs.' Valentino Tr. 34:1–11.)

Plaintiff testified that he had never encountered racism during his employment at Hillside Toyota prior to the October 8, 2020 dinner.  (Dep. of Sinisa Kekovic ("Defs.' Kekovic Tr.") 133:13–23, annexed to Schulman Decl. as Ex. B, Docket Entry No. 61-2.)

### c.  Post-dinner events

Plaintiff recounted that after the October 8, 2020 dinner, his "relationship with Amendola changed completely."  (Kekovic Decl.  ¶¶ 22.)  Prior to the dinner, on September 24 and 25,

---

[7]  (Pl.'s 56.1 Resp. ¶¶ 62–63; Kekovic Text Messages with Amendola, annexed to Schulman Decl. as Exhibit Q, Docket Entry No. 61-17; Kekovic Text Messages with Valentino, annexed to Schulman Decl. as Ex. R, Docket Entry No. 61-18.)

2020, Fatboy Solutions Inc. had begun installing a security camera system at Hillside Toyota. (Pl.'s 56.1 Resp. ¶ 56.)  Plaintiff testified that after the October 8, 2020 dinner, Defendants used the new security camera system to constantly surveil him.  (Pl.'s Kekovic Tr. 143:2–14.) Although Plaintiff could not remember the exact timeline, he testified that at some point after the cameras were installed, he went to Amendola's office and saw that there were at least five security camera viewing screens in Amendola's office, and the largest showed Plaintiff's desk. (*Id.* 144:10–12; 147:2–24.)  Plaintiff asked Amendola, "Why am I sitting on a camera of half of the screen and this is not the way it's supposed to be like this," and Amendola responded, "It's my job to make you feel uncomfortable." (*Id.* 144:24–145:3.)  Plaintiff estimated that 50 percent of the television screens depicting security footage exclusively displayed Plaintiff's desk, and the other 50 percent depicted different departments.  (*Id.* 147:2–24.)

Defendants deny that the cameras were focused on Plaintiff's desk or that Amendola told Plaintiff they were focused on his desk to make him uncomfortable.  (Answer to TAC ¶¶ 44–50.) In his sworn statement Amendola states that the large video screen in his office shows "the front of the showroom and the podium area . . . [and also] show[s] numerous vehicles in the showroom plus the desks on the podium, which are the four managers' desks." (Amendola Decl. ¶¶ 14–16.) He also stated that the podium camera shows just the top of the head of whoever sits at the desk that Plaintiff was assigned to, and that he has not adjusted the view of the cameras since they were installed.  (*Id.* ¶¶ 17–22; Security Camera Screenshot, annexed to Amendola Decl. as Ex. A, Docket Entry No. 60.)

Plaintiff testified that Amendola also retaliated against him by altering his work schedule to require him to be at the dealership from 8:00 AM to 8:00 PM, even though his scheduled hours were 10:00 AM to 6:00 PM.  (Pl.'s Kekovic Tr. 161:11–16; Pls' 56.1 Resp. ¶ 68.)  When

he asked Amendola why he was changing his hours, Amendola repeated, "It's my job to make you feel uncomfortable and that's what I'm doing." (Pl.'s Kekovic Tr. 161:17–21.) There was no Human Resources officer to report the change to, and although Plaintiff spoke to the other Hillside Toyota managers, "none of them got the same thing." (*Id.* 162:13–23.) Plaintiff told Amendola that he would not work the new schedule because those were not his contracted work hours. (Pl.'s 56.1 Resp. ¶ 68.) He also disputes that it was his responsibility to lock up the dealership, and that he was only ever required to work past closing time to complete a sale and the related financial paperwork. (*Id.* ¶ 66.)

Amendola testified that although Plaintiff and other managers had scheduled work hours, they were required to stay until all of the deliveries for that day were completed, which would often take place after the dealership itself had closed. (Defs.' Amendola Tr. 104:6–16.) While the schedule may show that managers are scheduled to work from 10:00 AM to 6:00 PM, "a lot of [Hillside Toyota] managers" will "work until the job is complete," including staying at the dealership until 11:00 PM or 12:00 AM, but that "[s]ome individuals took it upon themselves to work the schedule exactly as listed" and it "had to be reinforced to certain individuals of what time they should be here and what time they leave." (*Id.* 109:3–22.) In an April 22, 2021 email Amendola sent to Plaintiff and two other managers with a new schedule, five of Plaintiff's six shifts were changed to end at 7:00 PM or 8:00 PM, while most of the other managers' shifts were unchanged and ended at 6:00 PM. (Email of Salvatore Amendola to Sasha Kekovic dated Apr. 22, 2021, annexed to Myers Decl. as Ex. E, Docket Entry No. 65-5.)

Amendola terminated Plaintiff on January 20, 2022 and told Plaintiff, "We decided to move in a different direction." (Pl.'s Amendola Tr. 158:7–11; Pl.'s 56.1 Resp. ¶ 49.) The Hillside Toyota form terminating Plaintiff indicates that the reason for his termination was

"[p]osition obsolescence."  (Hillside Toyota Termination Form, annexed to Myers Decl. as Ex. F, Docket Entry No. 65-6.)  Amendola testified that there were a "multitude of reasons" why he decided to fire Plaintiff, including Plaintiff's conflicts with other employees, disagreements between Amendola and Plaintiff, Plaintiff undermining Amendola's authority, and Plaintiff not working his contracted hours.  (Pl.'s Amendola Tr. 158:7–22.)

Valentino testified that Amendola had wanted to fire Plaintiff "many times" but that Valentino talked him out of it.  (Defs.' Valentino Tr. 16:7–8.)  He had at least three conversations with Amendola about terminating Plaintiff due to "his ego, his outbursts, his screaming on the showroom floor at salespeople" and Plaintiff "not wanting to stay when he's supposed to stay."  (*Id.* 17:3–6.)  Valentino encouraged Amendola to talk to Plaintiff and "make him understand that we're a team" and that "[n]o individual can run a dealership."  (*Id.* 16:15–22.)  Plaintiff "wanted to work from 10:00 [AM] to 6:00 [PM] and just leave," but "[t]hat's not the way it works," and as the General Sales Manager, Plaintiff should have stayed until the end of the day as "the leader of that sales floor."  (*Id.* 17:7–14.)

Valentino testified that Amendola told him that he fired Plaintiff because he was an "egotistical maniac" who went into "steroid rages" and that it would be easier for Amendola to take on Plaintiff's job responsibilities himself.  (Defs.' Valentino Tr. 36:25–37:3.)  Amendola also testified that he terminated Plaintiff because he "[c]onsistently undermin[ed] [his] authority to his colleagues, other managers, employees, salespeople."  (Defs.' Amendola Tr. 159:3–4.)

Mike Morgan, the Human Resources Manager at Hillside Toyota, testified that three individuals complained to him about Plaintiff's behavior.  (Pl.'s 56.1 Resp. ¶ 25.)  The complaints were that Plaintiff was "very curt, rude, not approachable" but were "basic in nature"

8

and "nothing that would require . . . an HR write-up.  Just very anecdotal to a degree."  (Dep. of Mike Morgan 21:5–25, annexed to Schulman Decl. as Ex. G, Docket Entry No. 61-7.)[8]

Plaintiff disputes that he had any issues with his coworkers, had disagreements with Valentino or Amendola, or undermined their authority.  (Pl.'s 56.1 Resp. ¶¶ 37, 42, 47, 50.) Plaintiff cites to a reference letter Amendola wrote that said Plaintiff "has been an exemplary employee with great work ethic and attitude towards his work and performance on the job.  His interpersonal and communication skills have allowed him to develop productive working relationships with both our clients and our staff."  (Ltr. of Salvatore Amendola dated Apr. 15, 2021 ("Amendola Letter"), annexed to Myers Decl. as Ex. J, Docket Entry No. 65-10; Pl.'s Amendola Tr. 52:20–53:17.)  Plaintiff does not dispute that he did not work the additional hours after Amendola changed his schedule, but explains that he did not work them because they "differed from the hours he was contracted to work."  (Pl.'s 56.1 Resp. ¶ 68.)

Amendola testified that after firing Plaintiff, he "assumed the role of [Plaintiff's] position as a hybrid [General Sales Manager]/[G]eneral [M]anager running the" General Sales Manager position from a General Manager position.  (Defs.' Amendola Tr. 171:1–3.)  He testified that he is performing the General Sales Manager role, "which means the job has been deleted, and it's obsolete," (*id.* 171:18–22), but also testified that the General Sales Manager role was not

---

[8]  Defendants include affidavits from other Hillside Toyota employees who worked with Plaintiff attesting to his lackluster performance and tardiness at work, (*see e.g.*, Affidavit of Ramon Marmol ¶¶ 11–12, annexed to Schulman Decl. as Ex. K, Docket Entry No. 61-11; Affidavit of Kevin Ye ¶¶ 9–10, annexed to Schulman Decl. as Ex. L, Docket Entry No. 61-12), as well his rudeness and arrogance towards coworkers, including yelling at them, (*see, e.g.*, Affidavit of Darshanie Gocool ¶¶ 5–6, annexed to Schulman Decl. as Ex. M, Docket Entry No. 61-13; Affidavit of Jaclyn Bustilo ¶¶ 5–6, annexed to Schulman Decl. as Ex. N, Docket Entry No. 61-15; Affidavit of Ravindra Somra ¶ 4, annexed to Schulman Decl. as Ex. O, Docket Entry No. 61-15).  Plaintiff disputes that he had any issues with his coworkers.  (Pl.'s 56.1 Resp. ¶¶ 37, 42, 47, 50.)

obsolete because he "assumed the role," (Pl.'s Amendola Tr. 166:21–22.)  He also testified that he did not fire Plaintiff for incompetence.  (*Id.* 175:10–14.)  Valentino testified that he did not discuss eliminating the General Sales Manager position with Amendola.  (Defs.' Valentino Tr. 17:18–20.)  Plaintiff disputes that his General Sales Manager role was obsolete because Amendola assumed it.  (Pl.'s 56.1 Resp. ¶ 51.)

### d.   Post-termination events

Plaintiff contends that Valentino called local dealerships and gave them false information about Plaintiff after terminating him, but Defendants dispute that they did.  (TAC ¶ 65; Answer to TAC ¶ 65.)  For example, Plaintiff contends that after he arranged a meeting with the General Manager of Plaza Auto Mall to discuss potential employment, Valentino communicated false information about Plaintiff to the General Manager, resulting in the General Manager cancelling the meeting with Plaintiff.  (TAC ¶ 66; Answer to TAC ¶ 66.)

On December 18, 2022, Hillside Toyota, Valentino, and Amendola sued Plaintiff in New York state court for defamation, alleging that Plaintiff made derogatory statements about them in social media posts, as well as via texts and emails to Hillside Toyota's franchisor.[9]  (Pl.'s 56.1 ¶

---

[9]  Plaintiff argues that Defendants initiated the defamation lawsuit against him as retaliation.  (Pl.'s Opp'n 18–19.)  Defendants argue that "there is no good faith basis for [Plaintiff's] retaliation claim based on [Defendants'] defamation lawsuit."  (Defs.' Mem. 6, 11–12; Defs.' Reply 10.)  Plaintiff provides evidence that on August 22, 2022, Defendants' in-house lawyer told Plaintiff's counsel that, "if [Plaintiff] does not withdraw his claims, he will be facing a defamation lawsuit," and Defendants' complaint in the defamation lawsuit claims that Plaintiff defamed them by filing this case.  (Pl.'s Opp'n 18–19; Mesidor Decl. ¶¶ 2, 4; Myers Decl. ¶ 5; Summons and Verified Compl., *Domsco Motors LLC v. Kekovic*, No. 726538-2022 (N.Y. Sup. Ct. Dec. 18, 2022).)  However, because Defendants terminated Plaintiff on January 20, 2022, (Pl.s 56.1 Resp. ¶ 22), Defendants were no longer Plaintiff's employer either when Defendants' in-house counsel told Plaintiff's counsel to withdraw his claims or when Defendants filed the defamation lawsuit.  Because Title VII only prohibits *employers* from retaliating against *employees* for engaging in protected activity, Plaintiff's arguments about the defamation lawsuit are inapposite.  *See, e.g.*, *Banks v. General Motors, LLC*, 81 F.4th 242, 275 ("Title VII prohibits

70; Summons and Verified Compl., *Domsco Motors LLC v. Kekovic*, No. 726538-2022 (N.Y. Sup. Ct. Dec. 18, 2022), annexed to Myers Decl. as Ex. G, Docket Entry No. 65-7.) Plaintiff does not dispute that he made such comments but contends that they are not defamatory because they are true. ( Pl.'s 56.1 ¶ 70.)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Capitol Recs., LLC v. Vimeo, Inc.*, 125 F.4th 409, 418 (2d Cir. 2025) (quoting Fed. R. Civ. P. 56(a)); *see Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)); *see also Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party." (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126 (2d Cir. 2013))). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Lara-Grimaldi v. Cnty. of*

---

an employer from discriminating against an employee because the employee has engaged in protected activity." (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015))). Accordingly, the Court dismisses Plaintiff's retaliation claim to the extent Plaintiff based his allegations on this conduct.

*Putnam*, 132 F.4th 614, 633 (2d Cir. 2025) (quoting *Porter v. Dartmouth-Hitchcock*, 92 F.4th 129, 147 (2d Cir. 2024)); *see Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*; *Solid 21, Inc. v. Breitling U.S.A., Inc.*, 96 F.4th 265, 276 (2d Cir. 2024) ("The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the trier of fact could reasonably find for the non-movant." (quoting *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996))).  The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant."  *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia*, 706 F.3d at 127, 129); *see also Capitol Recs.*, 125 F.4th at 418 ("[A] genuine dispute as to a material fact precludes summary judgment 'where the evidence is such that a reasonable jury could decide in the non-movant's favor.'"  (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020))).

In cases that involve claims of discrimination, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare" and "the court must scrutinize affidavits and depositions carefully for circumstantial evidence that, if credited by the factfinder, could reasonably be interpreted as showing discrimination."  *Moll v. Telesector Res. Grp.*, 94 F.4th 218, 228 (2d Cir. 2024) (first quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001), *abrogated in part on other*

grounds by *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 169 (2009), and then citing *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (same) (quoting *Holtz*, 258 F.3d at 69).  However, "the salutary purposes of summary judgment — avoiding protracted and harassing trials — apply no less to discrimination cases than to . . . other areas of litigation." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). Striking this balance requires that "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985)); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz*, 258 F.3d at 69 (quoting *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997)) (citing *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).  "Because the district court is not to resolve issues of fact on a summary judgment motion, 'its determination of whether the circumstances give rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Abdelal v. Police Comm'r*, 857 F. App'x 30, 31 (2d Cir. 2021) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)).

### b.    Title VII and section 1981 claims

Defendants argue that the Court should grant summary judgment in their favor on Plaintiff's hostile work environment and retaliation claims.

### i. Hostile work environment claims

Defendants argue that Plaintiff provides no evidence to support a claim for hostile work environment. First, they argue that Plaintiff's only proof that Valentino said, "[t]here are no 'n****rs here,'" is "Kekovic's self-serving allegation." (Defs.' Mem. 7; Defs.' Reply 2.) They note that, "[i]mmediately after the dinner, Kekovic sent friendly texts to Amendola and Valentino, sharing the waiter's steak carving, and he also thanks Valentino [for the dinner] and sent a business-related comment to Amendola." (Defs.' Mem. 7; Defs.' Reply 2.) They also argue that Plaintiff has no evidence that he complained about the alleged remark. (Defs.' Reply 2.) Second, Defendants argue that even if Valentino did make the alleged comment, an "isolated comment is not sufficiently hostile to make out a claim for hostile work environment, especially where Plaintiff testified that he never heard anything at all about race at Hillside Toyota." (Defs.' Mem. 7.) Defendants argue that "there must be more than a few isolated instances of racial enmity" for "racist comments, slurs, and jokes to constitute a hostile work environment." (*Id.* at 8 (quoting *Petit v. Goodyear Dunlop Tires N. Am., Ltd.*, No. 00-CV-951, 2001 WL 1397860, at *4 (W.D.N.Y. Nov. 5, 2001)).) They also argue that no district court in the Second Circuit has "held that using the n-word outside of the workplace, in a manner not targeted towards an employee, is actionable."[10] (Defs.' Reply 5.)

---

[10] In reviewing evidence on a summary judgment motion for hostile work environment, courts may consider conduct that took place outside of the physical work environment when it affects the employee's work environment. *See, e.g.*, *Ferrando-Dehtiar v. Anesthesia Grp. of Albany, P.C.*, 727 F. Supp. 3d 165, 187 (N.D.NY. 2024) (explaining that evidence for a hostile work environment claim "can also include conduct that is outside of the physical work environment"); *Paola v. DeJoy*, 624 F. Supp. 3d 305, 319 (W.D.N.Y. 2022) ("While a court may consider conduct alleged to have occurred outside the work environment as part of the 'totality of the circumstances' when assessing a hostile work environment claim, such actions 'cannot, in themselves, give rise to such a claim; what matters in the end is plaintiff's *work* environment.'" (quoting *Whipple v. Reed Eye Assocs.*, 524 F. Supp. 3d 76, 90–91 (W.D.N.Y. 2021))). Plaintiff's

Plaintiff argues that Defendants have not established that they did not create a hostile work environment for Plaintiff.  First, Plaintiff argues that Defendants "largely speak in generalities about the number of comments . . . necessary to establish objective hostility," which "omits discussion of the specific facts of this case, and their severity." (Pl.'s Opp'n 6.)  In support, Plaintiff argues that Defendants' "sole attempt to address the relevant facts is to claim that the Court should disbelieve Plaintiff's 'self-serving allegation' about Valentino's use of the N-word, seemingly in favor of Valentino and Amendola's complete lack of recollection of any of the words spoken at the [October 8, 2020] dinner." (*Id.* at 7.)  Plaintiff notes that "such credibility determinations" are beyond the scope of Defendants' motion for summary judgment. (*Id.*)  Second, Plaintiff argues that the Second Circuit has recognized that the use of racial epithets, and in particular the N-word, are "uniquely severe" and can be sufficient to establish a hostile work environment.  (*Id.* at 7–8 (citing *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2012)).)  Third, Plaintiff argues that, "on the heels of Valentino's racial slurs, Defendants effectively ostracized Plaintiff from his job." (*Id.* at 8.)  In support, Plaintiff argues that after the October 8, 2020 dinner, Valentino directed "prestigious clients" away from Plaintiff, "undermin[ing] Plaintiff's leadership and standing on the sales floor" and Amendola "became noticeably hostile to Plaintiff," while the operations manager, "who previously increased Plaintiff's commission percentage, ceased answering Plaintiff's emails and text messages." (*Id.* (quoting Kekovic Decl. ¶¶ 30–33).)  Plaintiff argues that "considering the totality of the circumstances together with the undoubted severity of the N-word," Plaintiff has

---

claims are based on Defendants' workplace behavior in response to Plaintiff's complaints about comments Valentino made at an off-site dinner.  Defendants' argument that no district court in the Second Circuit has "held that using the n-word outside of the workplace" is actionable is misplaced.

established that whether his "work environment was objectively hostile is certainly a question for the jury." (*Id.*)

To establish a Title VII hostile work environment claim, "a plaintiff must 'produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 261 (2d Cir. 2023) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)); *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020) (similar) (quoting *Desardouin v. City of Rochester*, 708 F.3d at 105 (2d Cir. 2013)); *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (quoting *Gorzynski*, 596 F.3d at 102); *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Hostile work environment claims under section 1981 are evaluated under the same framework as those under Title VII.  *See, e.g.*, *Banks*, 81 F.4th at 261–62 (explaining that "[h]ostile work environment claims brought under Title VII [and] § 1981" are "assessed using the same standard" at the summary judgment stage) (citations omitted); *Zeng v. N.Y.C. Hous. Auth.*, No. 22-CV-138, 2023 WL 4553416, at *2 n.2 (2d Cir. July 17, 2023) ("We analyze [the plaintiff's] hostile work environment . . . and retaliation claims under Section 1981 utilizing the Title VII framework." (citations omitted)).  "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 91 (2d Cir. 2019) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).  A plaintiff "must ultimately prove conduct . . . that creates such an environment because of the plaintiff's" protected characteristic. *Tassy v. Buttigeg*, 51 F.4th 521, 533 (2d Cir. 2022) (quoting

16

*Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)); *LeGrand v. Walmart Stores E., LP*, 779 F. App'x 779, 782 (2d Cir. 2019) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)). The Second Circuit has cautioned that:

> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'"

*Terry*, 336 F.3d at 148 (alteration in original) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). A court should consider the totality of the circumstances and factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Banks*, 81 F.4th at 262 (citation omitted); *Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018) (same) (quoting *Littlejohn*, 795 F.3d at 320–21); *Patane*, 508 F.3d at 113. In evaluating whether a plaintiff has established a hostile work environment claim, the court must consider facially neutral conduct that might "bolster a harassment claim" when the facially neutral conduct is by the same individual who engaged in "overt[]" discrimination. *See Daniel v. T&M Prot. Res., LLC*, 689 F. App'x 1, 3–4 (2d Cir. 2017) (quoting *Kaytor*, 609 F.3d at 547–48) (remanding with instructions to the district court to consider facially neutral incidents of harassment in analyzing the plaintiff's hostile work environment claim).

To hold an employer liable for a hostile work environment under Title VII, federal law requires the plaintiff to show "a specific basis . . . for imputing the conduct that created the hostile work environment to the employer." *Williams v. N.Y.C. Housing Auth.*, 61 F.4th 55, 69 (2d Cir. 2023) (quoting *Whidbee*, 223 F.3d at 72); *Bentley*, 935 F.3d at 90 (quoting *Summa*, 708

17

F.3d at 124); *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 6 (2d Cir. 2017) (explaining that "the substantive standards under Title VII and Section 1981 are similar," and then noting that a plaintiff must show "a specific basis exists for imputing the objectionable conduct to the employer." (first quoting *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 151 n.6 (2d Cir. 2014), and then quoting *Tolbert*, 790 F.3d at 439)). "Two such bases exist: strict vicarious liability if an employer's supervisor has created the hostile environment; and negligence if a co-worker who is not a supervisor has created the environment, and the employer, upon becoming aware of the misconduct fails to remedy it." *Bentley*, 935 F.3d at 90 (first citing *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015); and then citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013)); *see also Hamilton v. Fed. Sav. Bank*, No. 21-CV-6852, 2024 WL 4132373, at *7–8 (E.D.N.Y. Sept. 10, 2024) (explaining the that the two bases for employer liability under Title VII and section 1981 are "strict vicarious liability if an employer's supervisor has created the hostile environment" and "negligence if a co-worker who is not a supervisor has created the hostile work environment" (quoting *Bentley*, 935 F.3d at 90–91)); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 87 (E.D.N.Y. 2020) ("An employer . . . can be held vicariously liable under Title VII for the unlawful conduct of supervisors with the capacity to take 'tangible employment actions.'" (quoting *Setty v. Fitness*, No. 17-CV-6504, 2018 WL 8415414, at *7 (E.D.N.Y. Dec. 18, 2018)), *report and recommendation adopted sub nom.*, *Setty v. Synergy Fitness*, 2019 WL 1292431 (E.D.N.Y. Mar. 21, 2019))). "[A]n employee is a supervisor only 'when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."'" *Bentley*, 935 F.3d at 91 (quoting *Vance v. Ball State Univ.*, 570

18

U.S. 421, 431 (2013)); *Hamilton*, 2024 WL 4132373, at *8 (applying the same standard to a section 1981 claim).

Defendants have failed to demonstrate that there is no genuine dispute of material fact as to Plaintiffs' hostile work environment claims under Title VII and section 1981.[11]  There is a dispute of material fact as to whether Valentino used the N-word at the October 8, 2020 dinner. Plaintiff testified that Valentino used the word "n*****r" twice during a work dinner with Plaintiff and Amendola, and after Plaintiff told him that he was married to a Black woman and had two children who are also Black, Valentino turned to Amendola and asked, "[H]ow much is this going to cost me?"  (Pl.'s Kekovic Tr. 129:16–130:17.)  Amendola testified he cannot remember any conversation at the October 8, 2020 dinner, (Pl.'s Amendola Tr. 83:6–18, 87:5–24), and Valentino testified that while he does not "recall the conversation" at the October 8, 2020 dinner, the word "n****r" is not part of his vocabulary, (Pl.'s Valentino Tr. 33:12–25; Defs. Valentino Tr. 34:1–11).  There is thus a genuine dispute of material fact as to whether Valentino used the N-word at the October 8, 2020 dinner.  The Second Circuit has "recognized that 'a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace.'"  *Banks*, 81 F.4th at 262 (quotation marks omitted) (first quoting *Cruz*, 202 F.3d at 570; and then quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)). "Multiple circuit courts have emphasized that 'perhaps no single act can more quickly alter the

---

[11]  Although Plaintiff does not belong to a "protected class," he may nevertheless bring a discrimination claim based on his association with members of a protected class and Plaintiff alleges "associational discrimination" claims based on his marriage.  *See Holcomb v. Iona College*, 521 F.3d 130, 138–39 (2d Cir. 2008) (holding that "an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race"; collecting cases, noting that the "Fifth, Sixth, and Eleventh Circuits agree" and that "[a]ll the district judges in this circuit to consider the question . . . have reached [the same] conclusion").

conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "n****r.""" *Banks*, 81 F.4th at 266 (citations omitted); *Daniel*, 689 F. App'x at 2 (vacating the district court's grant of summary judgment where the district court ruled as a matter of law that the one-time use of the word "n****r" could never "support a claim for a hostile work environment"); *Albert-Roberts v. GGG Const., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013) (explaining that "there may well exist circumstances where a single use of [n****r] would rise to the level of a hostile work environment.").

Based on Defendants' actions after the racial epithet, as testified to by Plaintiff, a reasonable juror could conclude that Valentino made the statements attributed to him by Plaintiff at the October 8, 2020 dinner, and after the dinner, Defendants altered their behavior toward Plaintiff and created a hostile work environment after he complained about Valentino's use of the N-word.  Plaintiff recounted that after the October 8, 2020 dinner, his "relationship with Amendola changed completely."  (Kekovic Decl. ¶¶ 22.)  Amendola stopped praising his performance on the sales floor and started "avoiding" him at work, (*id.* ¶¶ 23–26), and other managers changed their behavior towards him as well, (*id.* ¶ 30).  He faced increasingly hostile interactions with his supervisor, culminating in Amendola "no longer answer[ing] Plaintiff's emails or text messages," (Pl.'s Opp'n 3 (citing Kekovic Decl. ¶¶ 22–27, 29, 31, 33)), and making it difficult for Plaintiff to do his job.  Plaintiff testified that Amendola (1) told him it was Amendola's job to make him "uncomfortable," (2) was constantly surveilling him (and only him) through the new security camera footage, and (3) changed his schedule so that he had to work when the dealership was closed to the public.  (Pl.'s Kekovic Tr. 144:24–145:3; 147:2–24; 161:17–21.)  Plaintiff also recounted that Valentino stopped referring customers to him after the

October 8, 2020 dinner.  (*Id.* ¶¶ 31–32.)  Although only Valentino's use of the word "n****r" is

overtly racially discriminatory, a reasonable factfinder could conclude that Plaintiff has

established Defendants' actions after the October 8, 2020 dinner "altered his employment

conditions for the worse."  *Terry*, 336 F.3d at 148 (emphasis omitted); *see also Howley v. Town*

*of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (vacating summary judgment of hostile work

environment claim where conduct "diminish[ed] the respect accorded the [plaintiff] by

subordinates and thereby impair[ed] her ability to lead"); *Davis v. Verizon Wireless*, 389 F. Supp.

2d 458, 463, 474 (W.D.N.Y. 2005) (finding that the plaintiff's hostile work environment claim

survived summary judgment where defendant "denied her supervisory direction, and undermined

her ability to do her job by firing [individuals] that reported to her without first consulting her").

Valentino's racially discriminatory comment, when considered as part of the "totality of the

circumstances"— including Defendants constantly surveilling Plaintiff and forcing him to work

outside of normal working hours — preclude summary judgment of the hostile work

environment claim in Defendants' favor.  *Williams*, 61 F.4th at 74 (explaining that courts should

include facially neutral events in its "totality of the circumstances" analysis because the analysis

is "intended to provide courts with 'a realistic view of the work environment'" and the plaintiff

had claimed that the facially neutral events "adversely affected her work environment")

(citations omitted)); *Kaytor*, 609 F.3d at 547–48 ("Circumstantial evidence that facially []neutral

incidents were part of a pattern of discrimination on the basis of [a protected characteristic] may

consist of evidence that the same individual engaged in multiple acts of harassment, some

overtly [discriminatory] and some not." (internal quotation marks and citation omitted)).

Defendants' testimony that Plaintiff was insubordinate and rude could indeed be the reason that Plaintiff experienced growing hostility at work and was ultimately terminated — that is, the increasingly hostile work environment that Plaintiff complains of could be the result of a dislike for Plaintiff "as an individual, or because of some other motivation not prohibited by anti-discrimination law" — but these types of factual questions "must be resolved by a jury, rather than by a court at summary judgment." *Feingold*, 366 F.3d 151; *see also Brown v. Montefiore Med. Ctr.*, No. 19-CV-11474, 2024 WL 1367974, at *5 (S.D.N.Y. Mar. 31, 2024) ("Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury." (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005)).

Plaintiff has established that there are triable issues of material fact as to whether Corporate Defendants are liable for creating a hostile work environment under Title VII and section 1981, based on the severity and pervasiveness of the harassment and the fact that Amendola engaged in the harassing conduct and was Plaintiff's supervisor. *See Hoit v. Cap. Dist. Transp. Auth.*, 805 F. App'x 41, 45 (2d Cir. 2020) ("It is true, under Title VII, that an employer can be held strictly liable for the discriminatory conduct of a supervisor if the supervisor's conduct culminates in a tangible employment action." (citing *Vance*, 570 U.S. at 424)). The Court therefore denies Defendants' motion for summary judgment on Plaintiff's Title VII and section 1981 discrimination claims.

### ii.    Retaliation claims

Defendants argue that Plaintiff has not established that they retaliated against him. First, they argue that Plaintiff has not established a prima facie case of retaliation because Plaintiff did not provide evidence that there was a causal connection between the October 8, 2020 dinner and

Defendants' alleged retaliatory actions.  (Defs.' Mem. 10; Defs.' Reply 10.)  In support, they

argue that the video cameras were installed two weeks before the October 8, 2020 dinner and

that Plaintiff was "in no way ever targeted by a camera."  (Defs.' Mem. 4; Defs.' Reply 2.)  They

also argue that Plaintiff was "always required to work the full hours that the store was open" as

well as ensure that "all financial paperwork for any pending deal was completed" and the

dealership was locked up for the night, but that Plaintiff "repeatedly refused" to meet those

requirements.  (Defs.' Mem. 5.)  Defendants argue that after they implemented a written

schedule "listing [Plaintiff's] hours as additional hours," Plaintiff refused to work the hours

listed, and Plaintiff subsequently "testified that he never worked an increased schedule."  (*Id.*;

Defs.' Reply 2.)  Defendants further argue that there "is no evidence to support [Plaintiff's]

claim that his firing, fifteen (15) months after the dinner, was due to any retaliatory reason," but

rather was due to Plaintiff being an "out-of-control angry worker who was insubordinate and

toxic" and an "egotistical maniac who [went] into steroid rages."  (Defs.' Mem. 5–6; Defs.'

Reply 2.)  Second, they argue that there is "extensive evidence that Kekovic's own disruptive

behavior caused his termination," and that the "fifteen (15) month gap in this case cannot support

a retaliation case, as a matter of law."  (Defs.' Mem. 10; Defs.' Reply 8.)

Plaintiff argues that Defendants are not entitled to summary judgment on his retaliation

claim for several reasons.  First, Plaintiff argues that Defendants "focus entirely on . . . arguing

that the temporal proximity between Plaintiff's complaints and his termination is too attenuated,"

disregarding "the fact that there are other methods" to establish a prima facie case of retaliation.

(Pl.'s Opp'n. 11–12.)  Plaintiff argues that he has demonstrated a minimal inference of retaliation

through (1) his testimony that Amendola told him to "leave it alone" when Plaintiff indicated he

wanted to complain about Valentino's remark; (2) the video surveillance focused on Plaintiff's

desk; (3) his testimony that Amendola told Plaintiff it was his job to make Plaintiff "uncomfortable"; (4) his sworn statements that Amendola stopped assisting Plaintiff and undermined his authority; and (5) the change in Plaintiff's work schedule.  (*Id.* at 11–14.)  Second, Plaintiff argues that Defendants' reasons for terminating him are pretextual.  (*Id.* at 14–18.)  In support Plaintiff argues that (1) Defendants have changed their stated reasoning for terminating Plaintiff from "position obsolescence" to "rude, unprofessional and insubordinate behavior," (*id.* at 14–15); (2) cite no evidence in support of their contention that Plaintiff was an "egotistical maniac who goes on steroid rages," (*id.* at 16–17); and (3) Amendola wrote a letter praising Plaintiff's interpersonal and communication skills in April of 2021, (*id.* at 17; Amendola Letter dated Apr. 15, 2021).

Title VII prohibits retaliation against an employee who "has opposed any practice [that is] made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a); *Green v. Mount Sinai Health Sys., Inc.*, 826 F. App'x 124, 125 (2d Cir. 2020) ("Title VII prohibits employers from retaliating against any employee because that individual has opposed any practice made unlawful by Title VII." (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015))).  Retaliation claims under section 1981 are evaluated under the same framework as those under Title VII.  *See, e.g.*, *Banks*, 81 F.4th at 275 (evaluating "retaliation claims brought under . . . [section] 1981" using the "same standards as federal claims under Title VII"); *Zeng*, 2023 WL 4553416, at *2 n.2 ("We analyze [the plaintiff's] hostile work environment . . . and retaliation claims under Section 1981 utilizing the Title VII framework." (citations omitted)).  Title VII retaliation claims are evaluated using the *McDonnell Douglas* burden-shifting framework.  *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 178 (2d Cir. 2023); *Russell v. N.Y. Univ.*, 739 F. App'x 28, 32 (2d Cir. 2018) (citing *Duplan*, 888 F.3d at 625);

24

*Alvarado*, 685 F. App'x at 7 (explaining that retaliation claims under Title VII and section 1981 are evaluated under "the same three-step burden shifting framework derived from *McDonnell Douglas*" (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010))).  Under the framework, the plaintiff must first establish "a *prima facie* case of retaliation."  *Carr*, 76 F.4th at 178 (quoting *Hicks*, 593 F.3d at 164).  To establish a prima facie case of retaliation under Title VII and section 1981, a plaintiff must show that "'(1) she engaged in a protected activity; (2) [plaintiff]'s employer was aware of this [protected] activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.'"[12]  *Hernandez v. Kwait Eye and Laser Surgery, PLLC*, No. 23-7679, 2024 WL 5116365, at *3 (2d Cir. Dec. 16, 2024) (quoting *Summa*, 708 F.3d at 125); *Littlejohn*, 795 F.3d at 315–16 (similar) (quoting *Hicks*, 593 F.3d at 164); *Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022) (using the same *prima facie* standard to evaluate a retaliation claim at the summary judgment stage under section 1981).  If the plaintiff sustains this initial "*de minimis*" burden, *Duplan*, 888 F.3d at 626, a "presumption of retaliation" arises and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action," *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14 (2d Cir. 2018) (quoting *Hicks*, 593 F.3d at 164).  "If the defendant does so, then the burden shifts back to the plaintiff[ ] . . . [to] show that the reason offered by the employer is merely pretext, and that the employer's 'desire to retaliate' was the actual 'but-for cause of the challenged employment

---

[12]  The Supreme Court's decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), held that to allege an adverse employment action under Title VII, the plaintiff must only show "some harm respecting an identifiable term or condition of employment."  *Id.* at 347.  *Muldrow* "overruled [Second Circuit] precedent, which required that the changes to a term or condition of employment be materially adverse."  *Back v. Hapoalim*, No. 24-1064, 2024 WL 4746263, at *2 (2d Cir. Nov. 12, 2024) (citing *Muldrow*, 601 U.S. at 353 & n. 1).

action.'" *Id.* (quoting *Ya-Chen Chen*, 805 F.3d at 70). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan*, 888 F.3d at 625 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90–91 (2d Cir. 2015)); *Alvarado*, 685 F. App'x at 7 (applying the same standard to a section 1981 retaliation claim) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

### 1. Prima facie case

The parties do not dispute that Plaintiff satisfies the first three elements of a prima facie case: (1) Plaintiff engaged in a protected activity when he complained about the comment at the October 8, 2020 dinner; (2) Defendants were aware of that activity since he complained to Amendola; and (3) Defendants took adverse employment actions against Plaintiff when they changed his scheduled work hours and terminated him.[13]  The Court therefore only addresses

---

[13] While the parties dispute whether Defendants' newly installed video surveillance cameras targeted Plaintiff and "constantly surveilled" him, (Answer to TAC ¶¶ 44–50), it is undisputed that after the October 8, 2020 dinner and Plaintiff's complaints about Valentino's comments, Defendants (1) altered Plaintiff's work schedule, (Email of Salvatore Amendola to Sasha Kekovic dated Apr. 22, 2021) and (2) terminated Plaintiff, (Pl.'s 56.1 Resp. ¶ 49).  It is well-established that Plaintiff's termination, on its own, constitutes an adverse employment action for retaliation purposes.  *See, e.g.*, *Bart v. Golub Corp.*, 96 F.4th 566, 576 (2d Cir. 2024) (identifying termination as an adverse employment action), *cert. denied sub nom. The Golub Corp. v. Bart*, 145 S. Ct. 173 (2024); *King v. Aramark Servs. Inc.*, 96 F.4th 546, 562 n.7 (2d Cir. 2024) (same).  While Plaintiff's termination alone could be sufficient, the Second Circuit requires courts to consider "alleged acts of retaliation . . . both separately and in the aggregate," *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (citing *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)), and the Supreme Court has recently instructed that a plaintiff need not show "that the harm was significant[] [o]r serious, or substantial," but only demonstrate "*some* harm respecting an identifiable term or condition of employment," *Back v. Hapoalim*, 2024 WL 4746263, at *2 (quoting *Muldrow*, 601 U.S. at 355).  The Court accordingly concludes that Plaintiff has established Defendants' actions in the aggregate — including the alleged surveillance, change in schedule, and eventual termination — constitute adverse employment actions against him.  *Rackley v. Constellis, LLC*, No. 22-CV-4066, 2024 WL 3498718, at *30 (S.D.N.Y. June 17, 2024) (explaining that because "adverse actions in the retaliation context are

whether Plaintiff has demonstrated that a causal connection exists between the protected activity and the adverse actions.

A causal connection of retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotation marks and citation omitted); *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *see also Terry*, 336 F.3d at 152 ("Proof of such a causal connection 'can be established "directly through evidence of retaliatory animus directed against a plaintiff," or "indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . such as disparate treatment of fellow employees who engaged in similar conduct.""' (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir. 1999), *abrogated on other grounds by Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006))); *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (same).

Ordinarily, "the requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two."

---

to be considered not just individually, but also in aggregate," the defendant's "alleged actions [are] sufficiently substantial in gross to be actionable" (citing *Hicks*, 593 F.3d at 165)), *report and recommendation adopted as modified*, 2024 WL 3824108 (S.D.N.Y. Aug. 14, 2024); *Brown v. City Univ. of N.Y.*, No. 21-CV-854, 2022 WL 4637818, at *17 (E.D.N.Y. Sept. 30, 2022) (implementing negative changes to plaintiff's work schedule was an adverse employment action sufficient to support plaintiff's Title VII retaliation claim since it was "'harmful to the point that it could well dissuade a reasonable worker' from continuing to complain" (quoting *Vogel v. CA, Inc.*, 662 F. App'x 72, 76 (2d Cir. 2016))); *Brown v. Off. of State Comptroller*, 456 F. Supp. 3d 370, 402 (D. Conn. 2020) (finding the plaintiff "alleged several actions" that, in the aggregate, "rise to the level of adverse employment actions").

*Feingold*, 366 F.3d at 156–57 (collecting cases); *see also Vega*, 801 F.3d at 90 ("A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." (first citing *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001); and then citing *Gorzynski*, 596 F.3d at 110)); *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015) ("Ordinarily, causation may be inferred from close temporal proximity."). The Second Circuit has not defined "the outer limits beyond which a temporal relationship is too attenuated to establish causation." *See Gorzynski*, 596 F.3d at 110 ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship."); *see also Golden v. Syracuse Reg'l Airport Auth.*, No. 23-1311, 2024 WL 4116427 (2d Cir. Sept. 9, 2024) ("We have held that temporal proximity of five months or less supports the causation necessary for a prima facie claim of retaliation." (citing *Zann Kwan*, 737 F.3d at 845)).

Plaintiff has established a causal connection between his protected activity and adverse employment actions. Construing the evidence in the light most favorable to Plaintiff, Plaintiff has demonstrated that Defendants made adverse changes to his work schedule in April of 2021, between five and six months after the October 8, 2020 dinner and Plaintiff's complaints about Valentino's comments. (Email of Salvatore Amendola to Sasha Kekovic dated Apr. 22, 2021.) *See Summa*, 708 F.3d at 128–29 ("[W]e have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action. This has allowed our Court to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." (quoting *Espinal v. Goord*, 558 F.3d 119,

129 (2d Cir. 2009))); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (finding gap of five months potentially supportive of *prima facie* case of retaliation); *Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 284–85 (S.D.N.Y. 2024) (finding the plaintiff's claims of retaliation were "well within the window of temporal proximity" where the plaintiff alleged the defendants took adverse actions against him five months and nine months after engaging in protected activity, culminating in his termination two years after his first protected activity); *Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2018 WL 4259866, at *19 (E.D.N.Y. Sept. 5, 2018) (six-month gap was "sufficient to establish temporal proximity").  It is also undisputed that Defendants terminated Plaintiff on January 20, 2022, which is too attenuated to Plaintiff's protected activity to establish a causal connection on its own, but combined with the adverse changes in Plaintiff's working schedule and Plaintiff's testimony that Amendola told him it was his job to make Plaintiff "uncomfortable," (Pl.'s Kekovic Tr. 144:24–145:3; 161:17–21), establish the prima facie element of causation.  *See McNamara v. Cnty. of Saratoga*, 748 F. Supp. 3d 68, 96 (N.D.N.Y. 2024) (concluding that "the timing of the potentially retaliatory incidents . . . together with the context in which these incidents took place . . . is sufficient to establish a casual nexus"); *Ausch v. Garland*, 619 F. Supp. 3d 277, 293 (E.D.N.Y. 2022) ("Because [the p]laintiff is only required to make a minimal showing to support his *prima facie* case, he has established causation between the protected activities and the adverse actions through temporal proximity."); *Canales v. ACP Facility Servs., Inc.*, No. 17-CV-6937, 2019 WL 1171479, at *5 (E.D.N.Y. Mar. 13, 2019) (finding that a plaintiff who alleged that she was written up five-and-a-half months after the alleged protected activity and terminated four months thereafter had sufficiently alleged causation since the protected activity occurred "less than six months before the date of the first retaliatory action").  Viewing the evidence in the light most

favorable to Plaintiff, the Court concludes that Plaintiff has established a prima facie case of retaliation, and a presumption of retaliation arises. *See Davis-Garrett v. Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (explaining that at summary judgment, the court "must draw all reasonable inferences in favor of the nonmoving party," "even though contrary inferences might reasonably be drawn") (emphasis and citations omitted); *McNamara*, 748 F. Supp. 3d at 96.

### 2.    Legitimate, non-retaliatory justifications

Defendants articulate legitimate and nonretaliatory reasons for their adverse actions against Plaintiff.  It is undisputed that Defendants installed the video surveillance cameras prior to the October 8, 2020 dinner, (Pl.'s 56.1 Resp. ¶ 56), and Defendants argue that the video surveillance cameras thus could not have been installed to surveil Plaintiff, (Defs.' 56.1 ¶ 57). Amendola testified that he only changed Plaintiff's scheduled hours because he did not work the hours he and other managers were required to work and he had to "reinforce" to Plaintiff "what time they should be here and what time they leave."  (Defs.' Amendola Tr. 104:6–16, 109:3–22.) Amendola also testified that he decided to terminate Plaintiff because his position was obsolete. (Defs.' Amendola Tr. 171:15–22; Pl.'s Amendola Tr. 158:7–11.)  Defendants also provide affidavits from Plaintiff's coworkers attesting to his poor work performance and abrasive behaviors at work.  (*See, e.g.*, Affidavit of Ramon Marmol ¶¶ 11–12; Affidavit of Kevin Ye ¶¶ 9–10; Affidavit of Darshanie Gocool ¶¶ 5–6; Affidavit of Jaclyn Bustilo ¶¶ 5–6; Affidavit of Ravindra Somra ¶ 4.)  Based on this evidence, Defendants have proffered sufficient evidence for the adverse actions against Plaintiff, and the "presumption of retaliation dissipates," and the burden shifts back to Plaintiff to establish "that the desire to retaliate was the but-for cause of the challenged employment action."  *Ya-Chen Chen*, 805 F.3d at 70 (citation omitted).

### 3. Pretext

Plaintiff raises a dispute of material fact as to whether Defendants' reasons for their adverse actions are pretextual. First, Defendants' explanations of why Amendola terminated Plaintiff are inconsistent. Amendola told Plaintiff that they were terminating him because the dealership was moving "in a different direction," and later marked "[p]osition obsolescence," (Defs.' Amendola Tr. 171:15–20; Pl.'s Amendola Tr. 158:7–11; Hillside Toyota Termination Form), on Plaintiff's termination form. However, Amendola testified that he assumed Plaintiff's role, (Defs.' Amendola Tr. 175:10–14), and that marking "[p]osition obsolescence" was a "clerical error" and that Amendola terminated Plaintiff because he created an "uneasy work environment," and had "constant conflict with [Amendola] and [his] team." (Defs. Amendola Tr. 176:3–14.) However, less than a year before Amendola terminated Plaintiff, Amendola wrote in a character reference letter that Plaintiff "has been an exemplary employee with great work ethic and attitude towards his work and performance on the job. His interpersonal and communication skills have allowed him to develop productive working relationships with both our clients and our staff." (Amendola Letter dated Apr. 15, 2021; Pl.'s Amendola Tr. 52:20–53:17.) Such inconsistencies in Defendants' explanation for terminating Plaintiff are sufficient for a reasonable trier of fact to determine that Defendants' proffered reasons for terminating Plaintiff were pretextual. *See Zann Kwan*, 737 F.3d at 846 (explaining that the pretext stage "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive" and that a plaintiff can fulfill this burden by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action"); *Sohnen v. Charter Commc'ns, Inc.*, No. 18-CV-6744, 2022 WL 900602, at *11 (E.D.N.Y. Mar.

31

28, 2022) (concluding that inconsistencies in the defendant's justifications for terminating the plaintiff raised a genuine issue of fact as to pretext); *Fasanello v. U.N. Int'l Sch.*, No. 19-CV-5281, 2022 WL 861555, at *13 (S.D.N.Y. Mar. 23, 2022) ("Plaintiff has put forth sufficient evidence to call into question [the defendant's] proffered explanation for his termination.").

Second, there is a genuine dispute of material fact as to whether Defendants' other adverse actions were a result of Plaintiff's complaints about the October 8, 2020 dinner. Plaintiff testified that Valentino implemented video surveillance and changed his work hours to make him "uncomfortable" and that the other managers were not subject to those changes. (Pl.'s Kekovic Tr. 144:10–147:24, 161:17–21; 162:13–23). Because the Court is required, on summary judgment, to accept Plaintiff's statements "as to matters on which [he] was competent to testify, including what [he] did, what [he] observed, and what [he] was told by company managers" and must also "disregard the contrary statements from . . . managers that a jury would not be required to believe," *Davis-Garett*, 921 F.3d at 46, the Court concludes that Plaintiff's testimony has sufficiently "demonstrat[ed] weaknesses" in Defendants' proffered legitimate reasons sufficient to deny summary judgment. *Zann Kwan*, 737 F.3d at 846; *McNamara*, 748 F. Supp. 3d at 98 (denying summary judgment after "[t]aking into account the indicia of retaliatory animus discussed above, the [c]ourt conclude[d] that [the] [p]laintiff ha[d] introduced sufficient evidence that, if credited, would allow a reasonable factfinder to conclude that the legitimate, non-discriminatory reason proffered by the [defendants] is pretextual"); *Osekavage v. Sam's E., Inc.*, 619 F. Supp. 3d 379, 394 (S.D.N.Y. 2022) ("Viewing the evidence in the light most favorable to [the] [p]laintiff, . . . [p]laintiff has, in addition to establishing temporal proximity, offered evidence of disparate treatment — evidence from which a reasonable jury could infer that the reasons proffered by [the] [d]efendants were a pretext for a retaliatory motivation.").

### c.    NYSHRL and NYCHRL claims

Defendants argue that the Court should grant summary judgment on Plaintiff's state and city law claims for hostile work environment and retaliation.[14]  (Defs.' Mem. 10–11; Defs.' Reply 8–10.)  In support, they argue that Plaintiff has not made any "allegation of discriminatory intent that raises any inference of a discriminatory motive."  (Defs.' Mem. 11; Defs.' Reply 8.)  Defendants also argue that Plaintiff has not established a retaliation claim under the NYCHRL because his hours did not increase and he was employed for fifteen months after the alleged comment.  (*Id.*)

Plaintiff argues that Defendants have not carried their burden of establishing that there is no dispute of material fact as to Plaintiff's NYSHRL and NYCHRL law hostile work environment claims.  First, Plaintiff notes that Defendants "do not present any argument on Plaintiff's state and city law hostile work environment claims," and overlook that both the NSYHRL and NYCHRL are "governed by vastly different standards" than Title VII.  (Pl.'s Opp'n 9.)  Second, Plaintiff argues that Defendants "completely neglect to argue" that their alleged conduct "does not rise above the level of 'what a reasonable victim of discrimination . . . would consider petty slights or trivial inconveniences.'"  (*Id.* at 10 (citations omitted).)  Plaintiff also argue that there are issues of fact as to his retaliation claims under the NYSHRL and NYCHRL, which use a "mixed-motive" causation test rather than the "more rigorous but-for causation" test under Title VII.  (*Id.* at 18.)

Because the Court concludes that Plaintiff's Title VII and section 1981 hostile work

---

[14]  While Defendants' briefing appears to apply a motion to dismiss standard rather than the standard for summary judgment, the Court construes all of their arguments as arguments in support of their motion for summary judgment.  For example, Defendants argue that "Plaintiff has failed to state a cognizable claim under the NYSHRL" and that "Plaintiff has failed to state a cognizable claim under the NYCHRL."  (Defs.' Mem. 10–11.)

environment and retaliation claims survive summary judgment, and in view of the fact that the NYSHRL and NYCHRL apply a more lenient standard than their federal counterparts, the Court denies the Corporate Defendants' motion for summary judgment as to Plaintiff's NYSHRL and NYCHRL hostile work environment and retaliation claims.[15]  *See Gordon-Mallett v. Mount Sinai Hosps. Grp., Inc.*, No. 22-CV-1159, 2024 WL 1513910, at *17 (S.D.N.Y. Apr. 8, 2024) ("Because [Plaintiff] has raised triable issues of material fact regarding her hostile work environment claims under Section 1981 and the NYSHRL, 'it follows that she has done the same under the NYCHRL's more lenient standard.'"  (quoting *Fernandez v. Wenig Saltiel LLP*, No. 19-CV-1979, 2024 WL 1345645, at *20 (E.D.N.Y. Mar. 29, 2024))); *Osekavage*, 619 F. Supp. 3d at 395 (denying summary judgment on the plaintiff's NYSHRL claims "for the same reasons that the [c]ourt found issues of facts as to [the] [p]laintiff's Title VII claims").

In addition, Plaintiff has offered evidence from which a reasonable jury could conclude that Valentino and Amendola are individually liable for creating a hostile work environment and retaliating against Plaintiff in violation of the NYSHRL and NYCHRL.

---

[15]  Historically, claims under the NYSHRL were "largely subject to the same analysis [courts] apply under Title VII."  *Reyes v. Westchester Cnty. Health Care Corp.*, No. 21-CV-410, 2021 WL 4944285, at *2 (2d Cir. Oct. 25, 2021) (citing *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014)).  However, "the NYSHRL was amended in 2019 to 'be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed.'"  *Cooper v. Franklin Templeton Invs.*, No. 22-CV-2763, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023) (quoting N.Y. Exec. L. § 300).  The Second Circuit recently noted that where "the conduct underlying [the p]laintiffs' claims occurred after August 12, 2019, the effective date of the NYSHRL amendments," courts "must apply [the] more liberal framework."  *Flanagan v. Girl Scouts of Suffolk Cnty., Inc.*, No. 23-7900, 2025 WL 1501751, at *3 (2d Cir. May 27, 2025) (citations omitted); *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) (explaining that "[t]he NYCHRL and NYSHRL employ a more liberal standard" than Title VII for retaliation claims).

"Unlike Title VII, individuals may be held liable for . . . claim[s] under the NYSHRL" and the NYCHRL.  *Soumekh v. LD Consulting Servs., Inc.*, No. 18-CV-6337, 2022 WL 20652789, at *8 (E.D.N.Y. Aug. 10, 2022); *Iwelu v. N.Y. State Off. of Mental Health*, No. 22-CV-3096, 2024 WL 2175938, at *5 (2d Cir. May 15, 2024) (recognizing that individual defendants can be held liable under the NYSHRL and NYCHL); *Phillips v. Fashion Inst. of Tech.*, No. 23-CV-375, 2024 WL 1005500, at *2–3 (2d Cir. Mar. 8, 2024) (evaluating NYSHRL and NYCHRL claims for hostile work environment and retaliation against individual defendants); *Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 307 (S.D.N.Y. 2015) ("[U]nlike federal law, New York state law permits individual liability." (citing *Feingold*, 366 F.3d at 158)).  "An individual may be held liable under the NYSHRL where . . . [she] is a supervisor that can make hiring and firing decisions."  *Antoine*, 489 F. Supp. 3d at 89 (citing *E.E.O.C. v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014)); *Mitchell v. Planned Parenthood of Greater New York, Inc.*, No 23-CV-1932, 2025 WL 1795378, at *17 (S.D.N.Y. June 30, 2025) ("Individual liability under the NYSHRL is 'limited to individuals with ownership interest or supervisors, who themselves, have authority to hire and fire employees." (quoting *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365–66 (S.D.N.Y. 2012))); *Suffolk Laundry Servs., Inc*., 48 F. Supp. 3d at 523 (stating that "[t]he NYSHRL allows for individual liability under two theories: . . . if the defendant has 'an ownership interest' in the employer or 'has the authority to hire and fire employees'" (first quoting *Tomka v. Seiler Corp*., 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998); and then citing N.Y. Exec. Law § 296(1))).  Under the NYCHRL, an individual may be liable for discriminatory conduct where the individual had "formal managerial or titular authority over a plaintiff" or "wield[ed] any

ability to dictate or administer the compensation, terms, conditions, or privileges of the plaintiff's employment." *Mitchell*, 2025 WL 1795378 (internal quotation marks omitted) (quoting *Russell v. N.Y. Univ.*, 42 N.Y.3d 377, 390 (2024)).

Valentino and Amendola both "actually participate[d] in the conduct giving rise to" plaintiff's hostile work environment and retaliation claims, *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 395 (S.D.N.Y. 2019) ("[L]iability under both the NYSHRL and NYCHRL is limited to those individual employees 'who actually participate[]d in the conduct giving rise to plaintiff's claim'"), and also had the "authority to hire or terminate" Hillside Toyota employees as required for liability under the NYSHRL and NYCHRL. *See, e.g.*, *Beniquez v. N.Y. State Unified Ct. Sys.*, No. 23-CV-7735, 2025 WL 861299, at *5 (S.D.N.Y. Mar. 18, 2025) ("[T]he NYCHRL 'provides liability for individual employees for discrimination when those employees have some supervisory role over the victim of their discrimination.'" (quoting *Russell*, 42 N.Y.3d at 389)); *Chen v. Shanghai Cafe Deluxe, Inc.*, No. 17-CV-2536, 2023 WL 2625791, at *4 (S.D.N.Y. Mar. 24, 2023) ("Under the NYSHRL, individual liability may be imposed if (1) a defendant has an ownership interest in the employer or, alternatively, has the authority to hire or terminate its employees; or (2) if a defendant aided and abetted the unlawful discriminatory acts of others." (citations omitted)); *Schaper*, 408 F. Supp. 3d at 394 ("Under the NYSHRL, 'an individual is properly subject to liability for discrimination when that individual qualifies as an 'employer,'" which is defined as an "individual [who] has an ownership interest in the relevant organization or the 'power to do more than carry out personnel decisions made by others.'" (citations omitted)). Plaintiff testified that Valentino used the N-word twice at the October 8, 2020 dinner, (Pl.'s Kekovic Tr. 129:16–130:2), that his relationship with Amendola changed "completely" after Plaintiff complained about Valentino's comments,

(Kekovic Decl. ¶¶ 17–22), ultimately culminating in Amendola terminating Plaintiff, (Defs.'

Amendola Tr. 171:15–20; Pl.'s Amendola Tr. 158:7–11.)  In addition, Valentino, as Amendola's

direct supervisor, testified that he had at least three conversations with Amendola about

terminating Plaintiff.  (Defs.' Valentino Tr. 16:7–17:14.)  The Individual Defendants are

therefore not entitled to summary judgment on Plaintiff's individual liability claims under the

NYSHRL and NYCHRL.  *Menos v. Uncle Nearest, Inc.*, No. 22-CV-1449, 2025 WL 917347, at

*17 (E.D.N.Y. Mar. 25, 2025) (denying summary judgment on NYSHRL and NYCHRL against

an individual where "all of the alleged retaliatory conduct traces back to decisions made by" the

defendant); *Schaper*, 408 F. Supp. at 396 (denying summary judgment on a NYCHRL claim

against an individual who "participated in discussions concerning the penalty that should be

imposed" on the plaintiff).

## III.  Conclusion

For the foregoing reasons, the Court denies Defendants' motion for summary judgment

as to Plaintiff's Title VII, section 1981, NYSHRL, and NYCHRL hostile work environment and

retaliation claims.

Dated: July 31, 2025
       Brooklyn, New York

                                          SO ORDERED:


                                          _____s/ MKB_____
                                          MARGO K. BRODIE
                                          United States District Judge